[Civ. No. 17771. First Dist., Div. One. Sept. 30, 1958.]

EDWARD L. ISRAEL et al., Appellants, v. JACK T. CAMPBELL, Respondent.

JACK T. CAMPBELL, Respondent, v. EDWARD L. ISRAEL, Appellant.

Esmond Schapiro and Lee E. Solomon for Appellants.

Barrett & Harkleroad and Worthington, Park & Worthington for Respondent.

BRAY, J.—Each of the parties sued the other in separate actions for breach of contract. The actions were consolidated for trial. Appellants appeal from a judgment of $13,123.14 in favor of respondent in the action brought by respondent and holding that appellants take nothing in the action brought by them.

## QUESTIONS INVOLVED

1. Was the court's finding as to the contract erroneous?

2. Did the court err in striking parol evidence of the meaning of the contract?

3. Was Edwards in default?

4. Damages: (a) Was Edwards' breach the proximate cause? (b) Uncertainty and alleged improper allowance.

5. Alleged error in permitting witness to refresh his recollection.

6. Did the award exceed the prayer of the complaint?

## RECORD

Appellants are copartners doing business under the name of Edwards Lumber and Manufacturing Company. They will be referred to as Edwards. Respondent does business under the name of Campbell Construction and Equipment Company, and will be referred to as Campbell. Edwards sued Campbell for $22,778.45 for lumber sold by the former to the latter pursuant to a contract and for $4,578.80 damages from

loss of profits. Campbell sued Edwards for failure to deliver lumber under said contract for $11,087.53 damages. During the trial this amount was increased to $30,079.96 by amendment to the complaint.

## Evidence

In June, 1953, Campbell had a contract with the United States Government to build 21,127 wooden pallets.[1] Negotiations between the parties resulted in a purchase order signed by Campbell being sent to Edwards. It stated: "Furnish and deliver, FOB Jobsite . . . 252,000 pcs-2″x6″x6′ DF S4S . . . All lumber to be certified #2 and better and to. be precision cut to length.[2] . . . Delivery to start on June 29, 1953 and to continue at the rate of 45,000 MBF per working day until completed." On July 1, 1953, Edwards wrote Campbell a letter stating: "Confirming our telephone conversation, we acknowledge receipt of the above order and accept same in all particulars except delivery is to commence at once and be completed within 90 days. We will endeavor to remain as close to your schedule as possible but cannot guarantee 45,000′ per each working day. Hoping this will be satisfactory, we are . . ." This letter was delivered by Israel Sr. who stated that he could not guarantee delivery of 45,000 board feet per day but felt that he could deliver the entire amount in the stipulated time. Mincey, Campbell's general superintendent, told him to do the best he possibly could. Mincey informed Israel of the job requirements schedule and the operation. The job was set up to produce 500 pallets a day. Under the purchase order Edwards could deliver green lumber. Campbell was going to "stick" the lumber to dry it. "Stick" means stacking the lumber with lathing in between so that the air can circulate around each piece separately. It was estimated that it would take three weeks to 30 days for drying and it was expected that Campbell would start to build pallets on August 1, 1953. The lumber ordered from Edwards would be all the lumber necessary for the pallets and it was not contemplated that any other would be bought.[3]

---

[1] A pallet is a wooden base to pile cartons on in loading ships.

[2] This expression meant exactly 6 feet long or 4 feet long as the case might be. DF meant Douglas Fir. S4S meant surfaced four sides.

[3] However, as appears later, the amount of lumber ordered was short by 11,176 board feet of the footage necessary to make the pallets required by the government contract.

From July 1 to August 1 Edwards delivered five loads totalling 81,958 board feet. Campbell was constantly complaining about the lack of delivery and about August 3 handed Edwards a written protest stating that the deliveries were deficient in amount and grade and were not precision cut; that the situation was "intolerable" and that unless Edwards started to comply with the purchase order in 48 hours Campbell would buy lumber when and where possible and would charge Edwards with any excess costs. Mincey complained to Israel about once a week and Israel would reply that the lumber was coming. In August Edwards delivered 12 loads totalling 224,851 board feet and one load in September of 15,030 board feet. There were a number of rejects, being pieces too short or warped or otherwise unusable. The rejects were either taken away by Edwards or sent back. They amounted to about 16,000-19,000 board feet. August 19 a letter was sent Edwards to the effect that the 48-hour period of grace mentioned in the previous letter had expired and that Campbell was proceeding to purchase material where and as possible. Any excess cost would be charged to Edwards' account. However, Campbell would accept such deliveries as Edwards could make.

It was stipulated that the amount of lumber delivered by Edwards for which Edwards received credit was of the gross amount of $22,778.45 less credits for rejects and back charges, or a net balance of $19,812.49.

1. THE CONTRACT.

■ The court found that the purchase order and the letter of July 1 constituted the entire contract between the parties and that there were no ambiguities in it. Edwards contends that the order was merely an offer and that the letter was a qualified acceptance which in turn became a new proposal which was never accepted, so that there was no contract. See section 1585, Civil Code, requiring an acceptance to be absolute and unqualified and stating that a qualified acceptance is a new proposal. See also *Four Oil Co.* v. *United Oil Producers,* 145 Cal. 623 [79 P. 366, 68 L.R.A. 226]; *May Hosiery Mills* v. *G. C. Hall & Son,* 77 Cal.App. 291 [246 P. 332]. However, here there was an acceptance of the counter-offer. It was not exactly expressed in words, but the actions of both parties show that they considered a contract as expressed in the two writings was entered into, modified to the extent that delivery of said lumber was to

be made over the 90-day period with delivery as near to 45,000 board feet per working day as possible. Edwards' complaint alleges that the parties entered into a written agreement in which Edwards agreed to sell and Campbell to buy certain lumber "delivery to be made within 90 days." The quantity and price are set forth the same as in the purchase order.

However, the finding that the *entire* contract between the parties consisted of the purchase order and the letter of July 1, 1953, is incorrect. It should have stated that these two writings and an oral acceptance agreeing to the modification above mentioned constituted the entire agreement between the parties. In another finding the court, in effect, so found. It stated that "it was the clear understanding of said parties that said contract provided that delivery of said lumber should be made over the ninety day period mentioned in said contract, with delivery as near to 45,000 ft. per working day as possible." This court has power to, and hereby does correct the findings as hereinabove set forth.

## 2. PAROL EVIDENCE.

█ Israel testified that in negotiating with Mincey, Israel stated that if Edwards could furnish "shorts" (pieces of lumber under 8 feet in length) the price would be considerably lower, that when he presented the July 1 letter to Mincey he recalled to Mincey that Edwards was to accumulate the material from mill shorts and he could not understand Campbell's request for 45,000 board feet per working day, that Mincey then told him that he understood the situation and that Israel should do the best he could. On the theory that the contract was not ambiguous, the court, on motion, struck out Israel's testimony concerning the shorts. Israel testified that he understood the contract to require delivery to be made within 90 days and in such manner as to conform as nearly as possible to the 45,000 board feet per day and that 90 days was a normal period for delivery of that volume of lumber. There was no ambiguity in the length of the lumber to be delivered. The contract specifically set forth the length. Assuming that the evidence should not have been stricken, no prejudice is shown as that evidence could not have changed the court's interpretation of the contract.

## 3. DEFAULT.

█ Appellants contend that at no time was Edwards in default, first, because the court's construction of the time

limit of the contract was wrong.[4] As we have shown, the court correctly construed the contract. Secondly, they contend that a statement made by Campbell to Israel at the time the letter demanding compliance within 48 hours was delivered, ''Don't take this letter too seriously,'' off-set the effect of the letter and prevented a default. However, according to Israel's own testimony, the statement of Campbell above quoted was immediately followed by ''We want to put ourselves on record, but the main thing is we want the lumber in there, and you take care of it and everything will be all right.'' At that time Campbell agreed to accept four carloads of 2 inches by 6 inches in 12 feet lengths which Israel said he could ship immediately and which Campbell was to cut to 6 foot lengths at Edwards' expense. These carloads were shipped and used. However, at least once a week during August, Mincey was demanding increased deliveries and Israel would state that the lumber was coming. On August 10 Campbell sent Edwards another letter expressing the requirement of urgency and stating that Campbell would find it necessary to buy lumber elsewhere. At a conference on August 25 Mincey discussed with Israel the failure to deliver precision cut lumber. Israel said he would have it resawed at his own expense. Even when default was finally declared Campbell notified Edwards that it would receive such deliveries as Edwards could make. The first purchase from another source made by Campbell was on September 4. The next was on September 22. During this period Edwards only made delivery of one load. The completion date of the government contract was October 13, which fact was known to Edwards. Campbell's pallet plant was ready about the first of August and was set up to produce about 500 pallets per day, which would have required about 45,000 board feet per day. Due to lack of lumber only 250 pallets were built in any day and only 2,500 in September. Actually Edwards only delivered 298,272 board feet out of 1,848,000 promised. Although respondent had some difficulty in getting the government to agree to accept #2 lumber, that fact did not excuse appellants' default. If appellants had delivered as agreed, no controversy could have arisen between the parties. It was no concern of appellants' what the government prescribed. Moreover, the government permitted #2 lumber to be used, and that was the kind that respondent obtained from other

---

[4]This contention is made in spite of the allegation in their complaint that the written contract required ''delivery to be made within 90 days.''

sources. The evidence amply supports the finding of default of Edwards. Appellants make other contentions that Campbell waived the delay in delivery, based upon appellants' version of conflicting testimony. One of these was Israel's testimony that he informed Campbell that the government inspector was not going to accept the lumber and thereupon delivery was waived by Campbell. The trial court resolved that conflict against appellants.

■ Appellants claim that Campbell was in default because it did not pay for the deliveries actually made in 10 days. As required by the contract, Campbell paid for the first delivery, but thereafter held back payment because many difficulties of arriving at the amount due arose because the lumber was improperly cut and back charges for the cost of remedying the defects which Edwards agreed to pay were not settled and were in dispute. Campbell was not in default. Some of the first shipments were accepted under protest and pending acceptance by the government. This did not amount to a default by Campbell, for when Edwards objected to such acceptance Mincey admitted it was a mistake.

Appellants contend that the contract was that appellants only agreed to do the best they could to deliver lumber and that there is no evidence that they did not do so and that the evidence shows that they did. As pointed out before, this was not the contract.

4. DAMAGES. (a) *Proximate cause.*

■ Appellants contend that the Edwards breach did not damage respondent but the real cause resulted from the difference in the lumber grade specifications in the government contract and those in the Edwards contract. Appellants contend that as a result of this difference there was a loss of lumber in regrading and cutting to meet the government regulations. These items were not charged to Edwards under Campbell's method of accounting which was to take the gross cost of all lumber and deduct from it as a credit to Edwards the amount of scrap and rejects. Therefore Edwards was only charged with the cost of lumber actually used for making pallets. It was Edwards' failure to deliver as required by the contract that compelled Campbell to buy lumber wherever it could. Under the exigencies of its contract with the government, Campbell was forced to purchase mostly rough random pieces which had to be cut to size. The court allowed Campbell the difference in the cost of the lumber between the

Edwards contract price and that Campbell was forced to pay plus the cost of cutting to size. This total amount was the damage proximately suffered by reason of Edwards' default.

(b) *Uncertainty and Alleged Improper Allowance.*

 Appellants contend that applicable to this case is the rule of *Austin* v. *Roberts* (1933), 130 Cal.App. 328, 338 [20 P.2d 97], that where there is evidence as to damages from various causes, as to a portion of which the defendant cannot be held responsible, and not evidence as to the portion of the damage resulting from the separate causes, the proof is too uncertain to permit the court to apportion a part or all of the proved damages to the acts for which the defendant is responsible. This rule is not applicable here. Respondent's damages came from only one *source,* namely, appellant's default. If there is some slight uncertainty as to the *amount* of the damage, then the rule of *Allen* v. *Gardner* (1954), 126 Cal.App.2d 335 [272 P.2d 99] applies: ''Appellants have misconceived the law applicable to this situation. They stand before the court as violators of their contract. Their acts caused damage, serious damage, to Gardner. Those facts were proved definitely and with certainty. . . . Uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage, is fatal. But the same certainty as to the amount of the damage is not required. An innocent party damaged by the acts of a contract violator will not be denied recovery simply because precise proof of the amount of damage is not available. The law only requires that some reasonable basis of computation be used, and will allow damages so computed even if the result reached is only an approximation.'' (P. 340.)

 This brings us to the items of damage which appellants claim were improperly allowed. (a) The contract price was $71.50 per thousand board feet. Campbell purchased the lumber from other sources at $68.16 per thousand board feet. Appellants contend they are entitled to a credit of the difference between these two prices. They are not entitled to such credit for the reason that the contract price was for precision cut lumber, while the lumber respondent was forced to buy was rough lumber which respondent had to cut. The court in determining respondent's damages added the cost of processing to the price respondent had to pay for the rough lumber. This was a proper method. The measure of damages in a situation of this kind is not the difference in market value where goods are readily available on the market, but the

value to contractee of the performance of the contract as against the damage occasioned to him by reason of nonperformance, in our case, the cost to Campbell of obtaining lumber in the condition it would have been supplied under the contract, less $8,388.48 "salvage from rejected lumber" subtracted from what the contract cost would have been to respondent had it been performed. This was a proper deduction as the actual cost to Campbell of performance by Edwards would have been that much less than the contract price. Particularly is this so when the court in determining what the actual cost to Campbell of Edwards' failure to perform was, deducted from the overall price of lumber purchased by Campbell, the salvage from all rejected lumber including the said $8,388.48 salvage.

(b) *Cost of handling.*

In this regard there was clear evidence that a separate five man operation had to be set up to handle and saw the repurchased lumber. And there was expert testimony that the cost is $5.00 per thousand board feet. This charge did not include the handling costs for any of the precision cut lumber which was purchased in that state, nor did it include cost of handling any lumber which respondent would have had to handle under the Edwards contract. This was sufficient proof to support the fact of damage and the amount of damage. Therefore, as no charges for handling material which would have been handled if Edwards had performed were included in this sum, this amount was properly included in respondent's damages.

(c) *Additional lift truck rental.*

The evidence established that it was necessary to rent additional lift trucks for the sawing or resawing operation. This item was not included in the costs of handling. Therefore the fact of damage resulting from the breach was established. The total rental for all lift trucks came to $3,175. Appellants were charged with $1,975. This was a sufficient approximation to prove the amount of damage. The trial court was not in error in awarding it.

(d) *Additional superintendent and clerk time and property rental.*

It took approximately five weeks to dismantle the plant. Edwards could not be charged for the cost of dismantling, as such cost would have been incurred by respond-

ents had Edwards performed its contract. The evidence shows that the charges for "additional superintendent time" and "additional clerk time" were for additional time required of these persons due to Edwards' nonperformance but did not include the dismantling time. There was some confusion concerning the clerk's pay between take home pay and actual pay. The amount found by the court was his actual pay. Respondent charged rental for the period October 15 to December 14, totaling $850. Respondent concedes that had Edwards completed its contract it would have taken respondent the approximately five weeks to dismantle which it actually took. Therefore respondent is not entitled to damages for that five-week period. This left only one month chargeable to Edwards' default. The rental was at the rate of $425 per. month. Thus, the amount of respondent's damages for rental was only $425 instead of $850, and the judgment should be reduced accordingly.

(c) *Loss of efficiency.*

█ This item represents the difference in payroll costs, on the basis of cost per pallet manufactured at a time when precision lumber was used and at a time when respondent had to start the process with rough repurchase lumber.

In *Burrell* v. *Southern California C. Co.* (1917), 35 Cal. App. 162 [169 P. 405], damages were sought for the nonuse of a plant because of delivery of defective machinery to be used therein. The damage was determined by taking two-thirds of 10 per cent of the value of the plant investment. The court held that it was not a proper item of damage because it was remote and speculative and not contemplated by the parties. However, in *Kenyon* v. *Goodall* (1853), 3 Cal. 257, it was held that the loss of time, value of services and wages of employees, caused by failure of a party to deliver machinery, are damages which are not remote but are proximate and immediate. And in *Allen* v. *Gardner, supra*, 126 Cal.App.2d 335, Gardner was allowed as damage a percentage of his overhead costs in the operation of the mixing of concrete, where this operation was commenced after Allen refused to deliver the special concrete ordered under the contract. It would seem that the latter two cases would permit the respondent to recover for this item. This item can be distinguished from the Burrell case on the basis of proof. There the estimation was made only on the basis of the rental value of the plant which was taken to be .10 per cent of the investment;

whereas, here there is actual proof of such loss of efficiency through the computation of costs of manufacture.

(f) Appellants claim that in the figures accepted by the court no credit was given appellants for lumber which was purchased by respondent from another source and used in the construction of pallets additional to those which the amount of lumber purchased from appellants would have constructed. However, appellants did receive credit therefor, it being included in the figure of $1,151.43 "Cost of 183 additional pallets."

(g) In arriving at respondent's damage respondent and the court deducted from the total adjusted gross cost of materials purchased from all sources the sum of $144,887.47 as the total adjusted cost to respondent if appellants had performed as agreed. In this latter figure was a credit to appellants of the sum of $19,992.52 being "Cost of lumber to cover rejected lumber." In arriving at $19,992.52 as the value of rejected lumber, respondent took 15 per cent of the total amount purchased, claiming this to be a percentage arrived at by experience. Appellants claim that this amount should be 23 per cent of a portion and 20 per cent of another portion of the total amount purchased. This contention is based upon a letter written by respondent to the government in which respondent estimated that its loss in this respect was 23 per cent before a certain change order was issued and 20 per cent thereafter. These latter percentages dealt with estimated cost of lumber rejected in connection with pallets delivered to the government. Respondent's figures were the actual cost of rejected lumber in connection with all lumber purchased by respondent. The actual figures of the amount of rejected lumber showed a figure slightly in excess of the 15 per cent. The court accepted respondent's 15 per cent figure, rather than the estimates in the letter. As that percentage is proved correct by the actual figures we see no error in the court's action.

Contrary to appellant's contention the court's figures do not charge Edwards for lumber delivered by Edwards within the specifications of the contract but rejected by the government as not being within its specifications.

5. Refreshing Recollection.

On rebuttal Mincey denied certain conversations in which Israel had testified Mincey consented to the delay by Edwards in performing the contract. Respondent then asked

him if there was any fact which refreshed his memory in that connection. He stated that it was a letter written by Campbell to Edwards cancelling the order for nondelivery, and which was not sent because of the witness' request that it be not sent. Appellants moved to strike out the witness' answer. Considerable discussion between court and counsel resulted as to whether or not the letter was admissible in evidence. Finally the court ruled that the letter was not admissible but that the witness' answer might stand, and that his reference to the letter was solely for the purpose of refreshing his memory. The limitation placed upon the answer by the court was such that the witness' statement as to what was in the letter was no proof of the facts therein stated. We see no error in the court's ruling.

6. AWARD AND PRAYER.

Campbell's complaint originally prayed for $11,087.53 damages. Campbell was permitted to amend to conform to the proof and to pray for $30,079.96 damages. The court awarded Campbell $13,123.14 and denied Edwards recovery on its complaint which prayed for $27,357.25. In arriving at the figure of $13,123.14 the court found that the gross figure that Edwards owed Campbell was $36,691.76 but that Edwards was entitled to a setoff of $23,568.62. Appellants contend that thereby respondent recovered judgment in excess of the $30,-079.96 prayed for and that the court should have given appellants judgment for $23,568.62 on its complaint and respondent judgment for $36,691.76 on its complaint. This is a rather involved and farfetched contention. It would have been ridiculous for the court to grant two judgments in this case. Where actions are consolidated there should be only one set of findings and conclusions of law and one judgment. Even if there were two sets this court would consider them as one. (See *Wolfson* v. *Beatty* (1953), 118 Cal.App.2d 392 [257 P.2d 1017]; *Clinton* v. *Hogan* (1947), 80 Cal.App.2d 815 [183 P.2d 50].) Issues between the same parties should not be decided piecemeal in the same litigation but should be settled in one set of findings and one judgment. (*Blume* v. *MacGregor* (1944), 64 Cal.App.2d 244, 249 [148 P.2d 656] (cross-complaint).) Moreover, the trial court could not have given judgment in favor of each party as each one charged the other with breach of the same contract. Appellants' right to a judgment could have been based only upon a finding that respondent breached the con-

tract. The court found to the contrary; hence, appellants' rights were limited to offsets and not to damages. The procedure contended for by appellants would result in contradictory findings and judgments.

The judgment is affirmed in the sum of $12,698.14. Respondent will recover costs.

Peters, P. J., and St. Clair, J. pro tem.,* concurred.

A petition for a rehearing was denied October 30, 1958, and appellants' petition for a hearing by the Supreme Court was denied November 26, 1958.