[Civ. No. 24714.   Second Dist., Div. One.   Oct. 17, 1961.]

J. C. PEACOCK, INC. (a Corporation), Respondent, v. JOHN H. HASKO et al., Appellants.

Ralph W. Evans and Guy Richards Crump for Appellants.

Danielson & St. Clair and Deryl Shumway for Respondent.

LILLIE, J. —Plaintiff instituted two actions, the first in 1953[1] and the second in 1955,[2] which arose out of the internal operation of its business during the years 1952 and 1953. Although both actions were consolidated for trial, separate judgments were rendered (in each instance against defendants) from which separate appeals were subsequently taken (Nos. 24714 and 25222). While a separate clerk's transcript has been filed in the above-numbered matters, pursuant to stipulation we are authorized to consider the single reporter's transcript of the oral proceedings below as a part of the record on each appeal.

The present appeal is from the judgment in the "bonus" case. Directed against defendants in their capacities as former employees of plaintiff corporation, the action sought full recovery of excessive bonuses paid to defendants for stated periods in the year 1952 as the result of an asserted conspiracy by defendants to cheat and defraud. In furtherance of such conspiracy the following fraudulent and wrongful acts were

[1]Referred to in the briefs as the "fraud" case, being for the recovery of secret profits realized by defendants from the operation of Pacific Aircraft Products to which concern plaintiff's work was subcontracted.

[2]Referred to in the briefs as the "bonus" case, being for the recovery of sums paid as bonuses to defendants for the year 1952.

alleged to have been performed: Plaintiff's inventory, as of December 31, 1952, was inflated by overvaluating materials on hand and work in progress—nonexistent and worthless items were included in plaintiff's inventory, thus increasing its net profits; in December of 1952 unfinished parts and materials worth about $65,000 were caused to be shipped or delivered in order to increase the apparent gross receipts and net profits of the business—shortly after January 1, 1953, these parts and materials were returned to plaintiff; sums approximating $60,000, representing shipments not actually made until January of 1953, were included in plaintiff's gross sales for the year 1952; in January of 1953 defendants represented to plaintiff that a profit and loss statement of J. C. Peacock Machine Company for the calendar year 1952, prepared under the direction of defendant Allroggen and showing a net profit of $220,000, was true and correct, whereas the true net profit of plaintiff corporation (after adjusting for errors resulting from activities of the defendants) was $63,784. As a result of the foregoing events and representations, there were paid to defendants as bonuses for the year 1952 sums totalling $27,496.77; these sums were in addition to regular salaries, the recovery of which was not sought, for that year. Three additional causes of action, each on a common count for money had and received, were also pleaded. Judgment was rendered as prayed for; it was also determined that certain defendants take nothing by their cross-complaint for salaries unpaid and for an accounting of the net profits for 1952 and 1953.

J. C. Peacock, plaintiff's president, and John H. Hasko, admittedly the principal defendant at bar, first met each other in 1950. At that time Hasko was the plant superintendent for United Aircraft Products which, it appears, had indicated an intention to close its Los Angeles plant; according to Hasko, this presented an opportunity to start a machine shop business of his own. He was looking for a factory building when he met Peacock, who owned all of the stock of the J. C. Peacock Machine Company.[3] While the latter company had a factory, it had practically no business. As a result of negotiations between Peacock and Hasko, an oral contract was entered into in August of that year which provided that Hasko, there and then employed as general manager of J. C. Peacock Machine Company, would be paid a monthly salary of

---

[3] In 1953, J. C. Peacock Machine Co., merged with J. C. Peacock, Inc., the plaintiff in this action. This merger, and the date thereof, are matters involved in the companion appeal. (No. 25222.)

$800 plus a bonus of ten per cent (10%) of the net annual profits of the business before income taxes. Later this bonus was increased to fifteen per cent (15%), applicable from the commencement of Hasko's employment; it was further agreed that an additional five per cent (5%) was to be paid to key men selected by Mr. Peacock.

After his employment as general manager, Hasko brought over to J. S. Peacock Machine Company some 25 or 30 former employees of United Aircraft Products. Defendant Plummer was hired as plant superintendent and defendant Greer as a machinist, later becoming foreman of the milling machine department. The trial court found that on or about April 4, 1951, defendants Hasko, Greer and Plummer joined one Hinman as partners in forming a machine shop business operating under the name of Pacific Aircraft Products; it was further found that said business was formed for the purpose of cheating and defrauding plaintiff in the subcontracting of work to such partnership. Substantial profits were realized from the partnership's transactions with plaintiff, amounting to more than $80,000 net between April of 1951 and April of 1953.[4]

The trial court further found that in January of 1953 Hasko and defendant Allroggen, who was in charge of the company's bookkeeping and accounting department, falsely and fraudulently represented to plaintiff that it had realized a net profit for the year 1952 of approximately $220,000, whereas the actual profits were substantially less. In reliance upon said representations, bonuses were paid to the defendants as follows: $24,094.57 to Hasko; $2,114.40 to Plummer; $1,056.19 to Allroggen and $230.86 to Greer.

Mr. Peacock, during all this time, had delegated administration of the company's management to Hasko, as business started to increase, he became more active and took over the accounting department in April of 1953. The employment of Allroggen terminated that month; Hasko was discharged in June of 1953 and Plummer in September of that year; Greer had previously resigned—in October of 1952.

Appellants contend that "the primary issue of fact" which is said to be "the true net profits for the year 1952" was not

---

[4]Such finding was made in the "fraud" case. Where actions are consolidated for trial, there should be but one set of findings (and conclusions of law) and one judgment; where there are two sets, as here, we may consider them as one (*Israel* v. *Campbell*, 163 Cal.App.2d 806, 820 [330 P.2d 83]). Other findings in the "fraud" case will be referred to without so designating them.

tried; that certain findings are without support either in the pleadings or proof; and that the trial court erred in concluding that appellants, assuming their disloyalty, forfeited all rights to the bonuses paid.

It is asserted by appellants that a determination of "the true net profits for the year 1952" is a condition precedent to any recovery by respondent; they argue that "should the net profits for 1952 turn out to be approximately $220,000, as the plaintiff alleges was represented, then its claim of false representation would fall and the grounds of its opposition to the full payment of bonuses . . . would be eliminated." Respondent, on the other hand, maintains that "[T]he true amount of net profits is not only not the primary issue, it is not an issue at all." The primary issue, says respondent, is this: "Did the defendants forfeit all claims to a bonus by reason of their fraud and disloyalty to the plaintiff, their employer?" We agree with respondent's position. ▪▪▪ Under the heading "Adverse Position" it is stated: "An agent is not permitted to acquire any interest in the subject matter of his agency, present or contingent, adverse to that of his principal, except upon full disclosure of the facts." (2 Cal.Jur.2d, Agency, § 106.) As stated earlier, one of the major examples of appellants' disloyalty was the formation of Pacific Aircraft Products by the defendants concerned for the principal purpose of benefiting from subcontracting work to that partnership.[5] A major example, in turn, of the benefit to defendants' partnership is found in the subcontracting of the partial machining of flap tracks; thus, Pacific Aircraft Products received some $61,000 for its work on flap tracks, which sum was more than $43,000 in excess of a fair price as calculated by the actual cost records of the partnership. Again, the first purchase order for flap tracks was issued by respondent to Pacific Aircraft Products in April of 1952, providing for 534 pieces at $61.75; in June 1952, after 54 were received, the partnership billed the last 480 pieces at $92 each and the increase was approved by Hasko—later after Mr. Peacock took a more active interest in the operation of the business, Hasko caused a change purchase order to be issued in May of 1953, dated back to June of 1952.

▪▪▪ Appellants' argument, it appears, is based on the premise that since respondent (particularly Mr. Peacock as

---

[5]In the first six months of 1952, more than 98% of Pacific Aircraft's total sales were to respondent; profits for this period exceeded $29,000, or more than 50% net profit on gross sales.

its principal stockholder) benefited to some extent by this subcontracting work, it is in no position to complain; but the law is to the contrary. ■ "It is a general principle of law that an agent must act within the terms of his authority, and a substantial variance therefrom defeats his right to compensation *even though* such *variance may have been advantageous to his principal.* Accordingly fraud, bad faith, gross misconduct, gross mismanagement, or a failure to follow instructions on the part of the agent forfeits his right to compensation for his services. For example, where an agent is guilty of concealment or nondisclosure of material facts relating to the subject matter of the agency, he forfeits his right to compensation. *It is not necessary that actual injury to the principal be shown"* (emphasis added). (3 C.J.S., Agency, § 182.) The Restatement also declares: "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a willful and deliberate breach of his contract of service, he *is not entitled to compensation even for properly performed services* for which no compensation is apportioned" (emphasis added). (Rest. 2d Agency, § 469.) Under comment a. to section 469, the following is found: "The duties of loyalty of the agent to the principal are stated in Sections 387-398. An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to compensation which otherwise would be due him . . . *This* is *true even though the conduct of the agent does not harm the principal, and even though the agent believes that his conduct is for the benefit of the principal and that he is justified in so acting"* (emphasis added). In 4 Williston, Contracts, revised edition, section 1022, the author says: "The duty of fidelity to his employment imposes on the employee not simply the positive duty of reasonably skillful performance of the work intrusted to him, but the negative duty of refraining from deception and from entering into relations giving him an interest inconsistent with that of the employer. Thus, deceptive and fraudulent statements or conduct not only renders the employee liable, but justifies his discharge. Generally, such conduct involves damage to the employer but it may be ground for discharge, though no damage is involved . . . An employee who violates these fundamental duties of loyalty cannot recover even for the services he has rendered."

■ It is plain that the relationships entered into by the

appellants with Pacific Aircraft Products were such as to put them, particularly Hasko, in the position of having to serve two masters. Except for Allroggen, they became directly interested as profit-sharing partners in the financial success of that company; as key personnel in the Peacock organization, they had the obligation to scrutinize with care their employer's subcontracts with Pacific Aircraft Products. The objects of the conspiracy, a larger bonus from plaintiff, clearly made it impossible for them to exercise the independent judgment in such matters which is expected of persons occupying a fiduciary relationship.[6] The question is not presented, incidentally, of any ratification of appellants' acts by the respondent—the record reveals that it was without knowledge of these acts until some time after May 1, 1953.

While, under the authorities mentioned above, an employee's disloyalty will work a forfeiture of his right to recover the stipulated compensation, a more novel question is presented when, as here, the same authorities are relied on to support an action by the employer to recover a percentage of the employer's profits already paid to the employee; such proceedings, it has been pointed out, "are not so common as the converse form of action." (5 Williston, Contracts [rev. ed.] § 1362 A.) Although there appears to be little decisional law on the precise subject, it is said that "If a principal has paid commissions in ignorance of fraud on the part of the agent forfeiting his right to compensation . . . such payments can be recovered back by the principal." (3 C.J.S., Agency, § 194.) Again, "where an employer has voluntarily made a payment of wages, he cannot recover it back, even though the employee by his subsequent conduct would have forfeited the right thereto if it had not been made. However, he may recover back any overpayments secured through fraud or mistake." (56 C.J.S., Master and Servant, § 120c.)

A "bonus," of course, is " 'something . . . given in addition to an agreed compensation.' " (*Jones* v. *Webb*, 195 Cal. 88, 90 [231 P. 560].) Cases have been cited by the respondent where plaintiff-employee sought recovery of a promised bonus and the court sustained the affirmative defense that any right to such bonus was forfeited by the employee in view of his disloyalty; thus, in *Abramson* v. *Dry Goods Refolding Co.*, 166 N.Y.S. 771, 773, the court reasoned that

---

[6] "The relationship of principal and agent is of a fiduciary nature." (*Walter H. Leimert Co.* v. *Woodson*, 125 Cal.App.2d 186, 189 [270 P.2d 95].)

"it would be absurd to force an employer to pay a stipulated bonus to his manager for services where the manager instead of rendering the services worked in his own interest instead of his employer's." See also *Maryland Credit Finance Corp.* v. *Hagerty,* 216 Md. 83 [139 A.2d 230]. A case more in point is *Pictorial Films, Inc.* v. *Salzburg,* 106 N.Y.S.2d 626. There the plaintiff-employer sued to recover amounts advanced to defendants as their share of the profits of plaintiff's business; subsequent to the making of such advances, the defendants were discharged for cause. The court observed that "before the advances were made to the defendants, they had already embarked upon the course of conduct which, when discovered, led to their discharge." Continuing, "Having already placed themselves in a position where they could not recover their stipulated shares of plaintiff's profits, they should not, in the Court's opinion, be allowed to retain what, if the facts had been known to plaintiff, it is reasonable to assume they could not have obtained from it. The law ought not and does not place a premium upon reticence and shrewdness in such circumstances." (P. 632.) Substituting "fraud and disloyalty" for "reticence and shrewdness" in the sentence last quoted, the observation of the New York court fits the facts at bar.

Appellants argue, nonetheless, that a finding of disloyalty does not warrant a forfeiture of *all* bonuses. "Let us assume," they say, "that he (Hasko) has been guilty of disloyalty and a wilful and deliberate breach of his contract of service in inflating and misrepresenting profits. On the other hand, let us say for 99 and 9/10% of his time he has properly performed services as plant manager and, in fact, performed them very well. (Witness the volume of business and profits.)" They refer to section 469 of the Restatement, *supra,* that a disloyal agent "is not entitled to compensation even for properly performed services *for which no compensation is apportioned"* (emphasis added). The question turns on whether respondent's covenant to pay wages is severable from its covenant to pay a stipulated bonus. In *Pacific Wharf etc. Co.* v. *Standard American Dredging Co.,* 184 Cal. 21, 25 [192 P. 847], the court said: "The rule is well settled that where several things are to be done under a contract, if the money consideration to be paid is apportioned to each of the items to be performed, the covenants are ordinarily regarded as severable and independent." And in *Simmons* v. *California Institute of Technology,* 34 Cal.2d 264, 275 [209 P.2d 581], the court declared: "Generally speaking, the test of whether

a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable.'' A ''divisible contract'' is defined by Williston as one ''under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor.'' (3 Williston, Contracts [rev. ed.] p. 2408.) We conclude that the division of compensation into two parts, wages and a stipulated bonus, did not sever the consideration therefor, namely, the performance of specific services by the appellants. We further conclude that where, as here, it was the intention of the parties to treat the contract as entire and where, quite obviously, the engagements of the parties would not have been entered into except upon the understanding that the full object should be performed, the contract was not divisible. See *World Sav. & Loan Assn.* v. *Kurtz Co.*, 183 Cal.App.2d 319, 328 [6 Cal.Rptr. 665].

Appellants' remaining contentions attack certain findings, either the sufficiency or relevancy thereof. First, it is asserted that Findings IV and V, pertaining to defendants' participation in the conspiracy which resulted in the formation of Pacific Aircraft Projects, are without support in the pleadings and without ''foundation on the face of the record.''[7]
■ With respect to the asserted pleading deficiency, appellants overlook the rule that fraud may be proved under a complaint on the common count (the second, third and fourth causes of action in the instant case). See *County of Santa Cruz* v. *McLeod*, 189 Cal.App.2d 222, 228 [11 Cal.Rptr. 249]—and cases therein cited. ■ Further on this point: ''It is well established in our practice that an action for money had and received will lie to recover money paid by mistake, under duress, oppression or where an undue advantage was taken of plaintiffs' situation whereby money was exacted to which the defendant had no legal right.'' (*Ezmirlian* v. *Otto*, 139 Cal.App. 486, 496 [34 P.2d 774].) ■ With respect to the claim that the findings in question are lacking in factual support, respondents point out that four findings (VI through IX), directed against each appellant, are in the

[7]Although it is ''counsel's duty, in the brief, to refer the reviewing court to those portions of the record on which he bases his . . . claims'' (4 Cal.Jur.2d 314), this requirement of the appellate process has not here been met. We shall have more to say on this subject in our disposition of the appeal in the ''fraud'' case (No. 25222).

language of the common counts; they are not challenged by appellants. Since findings thus phrased are adequate (*Hirschberg* v. *Rose,* 136 Cal.App. 653, 656 [29 P.2d 785]), and in view of the dereliction mentioned in footnote 6, we see no need to labor the matter further.

It is also argued that there was no trial of the issues covered by these same findings (IV and V). Finding IV relates to the conspiracy in general terms; Finding V makes mention of the particular overt acts accomplished. Since the existence of this conspiracy was one of the basic issues for determination—the trial, it appears, consumed some six weeks—it is difficult to follow appellants on this particular assignment of error; unless, as we see it, they are really complaining that the trial court made its final determination without ordering a reference to ascertain the actual amount of net profits for the year 1952. While there was some discussion in the course of the trial about the propriety of an order of reference, respondent's counsel took the position that no reference was required for the reason that his client was entitled to recover all profits realized by appellants upon a showing of fraud regardless of the actual amount involved. Accordingly, no finding was made as to the extent to which respondent was defrauded; however, as related earlier, there was substantial evidence to support the findings that appellants engaged in one or more of the specific fraudulent acts which are the subject of the challenged findings. We see no reason for a reversal on the grounds argued by appellants.

Finally, appellants urge that Findings XIII and XVIII, relating to the cross-complaint of Hasko and Plummer, are mere conclusions of law; they also claim that Findings XI and XVI, likewise relating to the cross-complaint of the same appellants, are erroneous. Upon consideration of these contentions, we deem them to be without merit.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.