Ryland H. **FORD**

v.

The **CHESAPEAKE AND OHIO RAILWAY COMPANY,** a Virginia Corporation.

Civ. A. No. 75–0050–R.

United States District Court, W. D. Virginia, Roanoke Division.

June 9, 1977.

Michael McH. Collins, Collins, Wilson, Collins & Singleton, Covington, Va., for plaintiff.

Philip L. Lotz, Lotz, Black, Coleman & Gudal, Staunton, Va., for defendant.

MEMORANDUM OPINION

TURK, Chief Judge.

In this action pursuant to § 307(a) of the Railroad Passenger Service Act, 45 U.S.C. § 547(a), Ryland Ford seeks to recover wages assertedly due him under a labor protective agreement, but which were withheld by his employer, the Chesapeake and Ohio Railway Company ("the Railway"). Mr. Ford worked for the Railway from 1946 until 1976 in various capacities and was designated a trucker C–179 (porter) at

Ronceverte, West Virginia in 1970. On May 1, 1971, Amtrak assumed responsibility for certain of the Railway's routes, thus abolishing the trucker C–179 position at Ronceverte. The Railroad Passenger Service Act ("Amtrak Act"), 45 U.S.C. § 501 *et seq.*, required that Amtrak and the Railway reach a "protective agreement" to cushion the impact of Amtrak "takeovers" upon the earning power of displaced employees such as Mr. Ford. The Railway entered into such a protective agreement with Amtrak, subsequently which was certified as fair and equitable by the Secretary of Labor, and incorporated by his direction in the collective bargaining agreement between the carrier and its employees. 45 U.S.C. § 565. Under its terms, Mr. Ford, as a displaced employee, had certain options. He could obtain a lump sum severance payment and retire from service, or he could elect to take advantage of a six-year guaranteed wage scheme keyed to his earnings as a trucker, the last position he had occupied. Mr. Ford chose the latter, commonly called the Amtrak guarantee.

The protective agreement at issue, Appendix C–1 to the collective bargaining agreement between the Railway and BRAC, Mr. Ford's collective bargaining agents, provides in pertinent part:

DISPLACEMENT ALLOWANCES—(a) So long after a displaced employee's displacement as he is unable, in the normal exercise of his seniority rights under existing agreements, rules and practices, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which he was displaced, he shall, during his protective period, be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the average monthly compensation received by him in the position from which he was displaced.

Each displaced employee's displacement allowance shall be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immediately preceding the date of his displacement as a result of the transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). Both the above "total compensation" and the "total time for which he was paid" shall be adjusted to reflect the reduction on an annual basis, if any, which would have occurred during the specified twelve month period had Public Law 91–169, amending the Hours of Service Act of 1907, been in effect throughout such period (i. e., 14 hours limit for any allowance paid during the period between December 26, 1970 and December 25, 1972 and 12 hours limit for any allowances paid thereafter); provided further, that such allowance shall also be adjusted to reflect subsequent general wage increases.

If a displaced employee's compensation in his retained position in any month is less in any month in which he performs work than the aforesaid average compensation (adjusted to reflect subsequent general wage increases) to which he would have been entitled, he shall be paid the difference, less compensation for time lost on account of his voluntary absences to the extent that he is not available for service equivalent to his average monthly time during the test period but if in his retained position he works in any month in excess of the aforesaid average monthly time paid for during the test period he shall be additionally compensated for such excess time at the rate of pay of the retained position.

(b) If a displaced employee fails to exercise his seniority rights to secure another position available to him which does not require a change in his place of residence, to which he is entitled under the working agreement and which carries a rate of pay and compensation exceeding those of the position which he elects to retain, he shall thereafter be treated for the purposes of this section as occupying the position he elects to decline.

(c) The displacement allowance shall cease prior to the expiration of the protective period in the event of the displaced employee's resignation, death, retirement or dismissal for justifiable cause.

The Railway does not dispute that Mr. Ford qualified in all respects under the terms and conditions set forth above for guaranteed Amtrak payments for a six-year period from the date of his displacement, that is, until April 30, 1977. Payments were commenced in May 1971. In October, 1974, however, the Railway determined it had overpaid Mr. Ford for the period January 1, 1972 until October 31, 1974 in the approximate amount of $11,197.71, and without notice to him ceased all payments in order to recoup that sum. Plaintiff accordingly received no compensation for a period in excess of one year, until the Railway by this method had recovered the asserted excess.

At trial, the Railway offered intricate and ultimately confusing explanations of how it overpaid Mr. Ford. Thus, it remains unclear under just what theory Mr. Ford was compensated during the period of alleged overpayment. It is clear, however, that scant precedent exists in the industry for the manner in which recoupment was effected. A member of the Railway's labor relations department testified that small overpayments were often made due to the complexity and multitude of agreements affecting wages, and the mechanical problems of establishing hours and rates of pay. In such cases, overpayments are recouped by withholding the relatively small amounts involved from the employee's next paycheck. No arbitral authority, collective bargaining agreement provisions or other authority was cited for complete cessation of income for the period involved here.

At trial it was disclosed that the "overpayments" were made to Mr. Ford when the Railway's payroll department, as advised by its labor relations department, calculated his compensation on the basis of payroll forms "improperly" submitted by Railway agents charged with preparing such forms. The "mistake", if there was one, was the Railway's. That "mistake" persisted for a substantial time, although the Railway's payroll and labor relations personnel had ample opportunity to review the payroll forms submitted by its agents on Mr. Ford's behalf. Moreover, the Railway has to this date failed to clarify in what respect the payments to Mr. Ford for the three-year period were excessive. As nearly as the court can determine, it is the Railway's contention that Mr. Ford was entitled under a collective bargaining agreement to a protected rate amounting to a percentage of the rate of pay of the position last held prior to the takeover for days actually worked, if such pay exceeded the Amtrak guarantee, and to the Amtrak guarantee for days not worked. One witness, Patrick R. Hickey, of the Railway's payroll department, testified that these two rates were improperly pyramided, thus creating an excess. It was also testified that Mr. Ford's monthly guarantee had been miscalculated by interpreting the average of his pay for the five months he actually worked as a trucker prior to the Amtrak takeover as a twelve-month average. Furthermore, it was implied at various points that certain agreements not within the scope of the protective agreement were improperly applied in arriving at Mr. Ford's pay.

This brief review underscores the complex nature of compensation in the railroad industry. Pay is determined not only by the protective agreements applicable under the Amtrak Act, but also by collective bargaining agreements and special side agreements. The Railroad, in paying Mr. Ford during the contested period, interpreted his Amtrak guarantee based upon a different conception of the test period, as that term is defined in § 5 of the protective agreement, than it adhered to when it stopped his compensation to recover the "excess" payments. That factor accounts for at least part of the "error." Thus, any overpayments made were not attributable to clerical or mathematical error. Rather, such overpayments were due to plausible interpretations of the provisions of agreements applicable to Mr.

Ford, including the federally mandated protective agreement.

■ The common law rule is that an employer may recover payments made mistakenly to an employee, subject to limitations dictated by equitable considerations. *Anno.*, 88 A.L.R.2d 1430, 1451–1452, and cases cited therein; *Anno.*, 40 A.L.R.2d 997, 1035–1036 and cases cited therein. However, where the employer's mistake has caused the employee to rely to his detriment, by foregoing other opportunities, recovery will be denied:

> Every prudent man accommodates his mode of living to what he supposes to be his income; it therefore works great prejudice to any man, if after having had credit given him in account for certain sums . . . he may be called upon to pay them back . . .

*Skyring v. Greenwood*, 107 Eng.Reprint 1064 (1825), cited in 40 A.L.R.2d at 1035–1036. Under the agreements applicable to plaintiff, he could have increased his earning power by exercising various work options available to him under the collective bargaining agreement, had he known of the Railway's later and more restrictive interpretation of his pay rate. To this extent, this forfeiture of opportunities worked a detriment upon him, and would serve to bar recovery in a contract action by the Railroad for the claimed excess. But the situation is here reversed, and the issue is whether Mr. Ford may be awarded the excess withheld. Since this is an action for equitable relief only, legal principles derived from private contract law do not apply of their own force. Secondly, the wage agreement in question is required by federal law and, because Mr. Ford is a union employee, applies by virtue of the collective bargaining agreement as well. Thus, the purpose of the Amtrak Act, and the principles derived from enforcement of collective bargaining agreements impinge on the resolution of this issue.[1]

In requiring protective agreements in the Amtrak Act, Congress was concerned with protecting employees affected by discontinuances of intercity rail passenger service against loss of income. 45 U.S.C. § 565. The Railroad's method of recoupment deprived Mr. Ford of his congressionally mandated Amtrak protection for over one year, and flies in the face of the purposes of the protective agreement. Indeed, § 5 of the protective agreement provides for payment of "a *monthly* displacement allowance." During the period of withholding, the Railway failed in its obligation to pay Mr. Ford that monthly allowance. Secondly, a practice continued over a substantial period of time may attain contractual status under the law of collective bargaining. In this case, the Railway interpreted the provisions for payment of Mr. Ford one way for a substantial period of time. Mr. Ford assumed a standard of living based upon that interpretation, and exercised his contractual work options accordingly.

■ To his detriment, Mr. Ford relied upon the Railway's interpretation of his

1. The Railway argues that Mr. Ford has failed to exhaust arbitration remedies and that therefore this action should be dismissed. This issue was decided adversely to the Railroad in this court's memorandum opinion of October 21, 1976. Moreover, the evidence at trial indicated that Mr. Ford had to arbitrate this claim, and that a grievance was filed on his behalf. There was testimony that Mr. Ford's claim was denied by the Railway on September 26, 1976, but that the matter is still pending. However, no testimony was adduced that the Union had determined to appeal the adverse Railway decision to the Third Division of the Railroad Adjustment Board. Thus, the claim is alive only in the most technical sense. On these facts, Mr. Ford appears to have done all he could to exhaust his contractual remedies. Moreover, § 304(a) of the Amtrak Act, upon which Mr. Ford sues here, provides him with an election of arbitral or judicial remedies. Because Mr. Ford's claim involves an interpretation of a federally imposed agreement, that is, of federal law, this court is an appropriate forum for resolving his claim. And although the protective agreement is clearly a "labor agreement" under § 304, it is not a wholly private collective bargaining agreement. Although the protective agreement is incorporated in the BRAC agreement, it nevertheless remains an agreement between Amtrak and the Railway. It is thus both a collectively bargained agreement and a federally imposed protective agreement. Both forums, arbitral and judicial, are suited for the adjudication of questions arising thereunder.

entitlement to compensation. He structured his work and living standard around that long adhered to interpretation. When his income was abruptly withheld for over one year, he was denied his right to monthly payments under the Amtrak protective agreement. In so concluding, the court does not dispute that the Railway may correct errors such as that involved here. It may not, however, do so by total garnishment of income without notice to the affected employee. Equally, the Railway should be required to make Mr. Ford whole for the losses he has sustained. Thus, the Railway should be required to repay Mr. Ford the sums it withheld, that is $11,-197.71. Furthermore, the Railway should be required to put Mr. Ford in *status quo ante* with respect to any retirement and insurance benefits, and should pay interest on the $11,197.71 from the date this suit was filed. This relief places Mr. Ford in the position he would have occupied but for the arbitrary withholding of benefits. Since the evidence at trial does not establish a means by which Mr. Ford could have mitigated this total loss of income consistent with his contract rights, no mitigation is required. Since the Railway may, of course, alter Mr. Ford's rate of pay to its interpretation of the agreements, Mr. Ford is not entitled to be paid through the expiration of the six-year guarantee period on the Railway's initial interpretation of his compensation. Nor are punitive damages warranted herein.

An order will be entered consistent with this opinion, and this opinion shall constitute the court's findings of fact and conclusions of law.

### FINAL ORDER

In accordance with the Memorandum Opinion this day filed, it is ADJUDGED and ORDERED as follows:

(1) The Plaintiff Ryland Ford shall have judgment against the defendant Chesapeake and Ohio Railway Company for $11,-197.71 with interest thereon at the rate of 8% per annum from April 9, 1975, the date this suit was filed, until paid.

(2) Defendant shall see that plaintiff's retirement and insurance benefits reflect this recovery so as to make them as fully beneficial to plaintiff in all ways as if he had continued to receive his guaranteed compensation without interruption.

(3) Defendant shall not be liable to plaintiff for punitive damages.

(4) The defendant shall be responsible for all taxable costs.

(5) The action is stricken from the docket of the Court.