ONYX PHARMACEUTICALS,
INC., Plaintiff,

v.

BAYER CORPORATION,
et al., Defendants.

No. C–09–2145 EMC.

United States District Court,
N.D. California.

Sept. 21, 2011.

Bradley Allen Waugh, Intel Litigation Group, Santa Clara, CA, Martin S. Schenker, Thomas J. Friel, Jr., Jeffrey Gutkin, Cooley LLP, San Francisco, CA, Michelle S. Rhyu, Daniel Jedediah Knauss, Cooley Godward Kronish LLP, Palo Alto, CA, for Plaintiff.

Alison Margaret Tucher, Amy Christine Dachtler, Morrison & Foerster LLP, San Francisco, CA, Brian Charles Swanson, Georgia N. Alexakis, J. Scott McBride, James Breckinridge Heaton, III, Jason Lloyd Peltz, Mark Leslie Levine, Philip Scott Beck, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, for Defendants.

# FINAL PRETRIAL CONFERENCE ORDER

EDWARD M. CHEN, District Judge.

A Final Pretrial Conference was held in this matter on September 20, 2011. Pursuant to Federal Rule of Civil Procedure 16(e), this order memorializes the Court's rulings and/or the parties' stipulations. Also attached are the Court's standing Guidelines for Trial.

## I. TRIAL DATE & LENGTH OF TRIAL

The trial shall begin on October 3, 2011, Courtroom 5, 17th Floor. There shall be a total of twelve court days.

Trial shall be conducted from 8:30 a.m. to 2:00 p.m. (or slightly longer to finish a witness), with one 15–minute break and one 40–minute lunch break. Parties must arrive by 8:00 a.m. or earlier as needed for any matters to be heard out of the presence of the jury. The jury will be called at 8:30 a.m. The trial week is Monday through Thursday, excluding holidays. Fridays are dark. If there are matters that need to be discussed (*e.g.*, objections to exhibits or witnesses), counsel should be prepared to meet with the Court at 8:00 a.m.

Plaintiff shall have 22 hours to present her evidence, and Defendant 22 hours. This includes direct examination by one side of its witnesses, cross-examination by that side of the opposing party's witnesses, and any rebuttal. This does not include jury selection, jury instructions, opening statements, or closing arguments. The Court may impose separate time limits for openings and closings.

## II. MOTIONS IN LIMINE

A. *Defendant's Motion in Limine (Docket No. 140)*

Bayer's Motion in Limine requests that the Court exclude four categories of evi-

dence. For the reasons set forth below, the Court DENIES the motion without prejudice.

### 1. *Evidence of Negotiators' Unexpressed Intent*

Bayer seeks to prevent Onyx from introducing evidence as to the unexpressed intent and understanding of Onyx's negotiators to the Collaboration Agreement. Mot. in Limine, Docket No. 140 ("Mot."), at 1. These witnesses are Frank McCormick, Bob Jones, and Hollings Renton. Bayer contends that their testimony as to the meaning of the contract is inadmissible under Rule 402 and 403 because they merely testify as to their own subjective, which is irrelevant under California law. Mot. at 2. Bayer asks the Court to restrict the testimony of these witnesses to objective, expressed intent rather than subjective, understood intent. Onyx counters that these witnesses will testify not as to their subjective intent, but rather the parties' mutual intent and understanding of the contract terms. It argues that the witnesses are permitted to testify as to expressed and unexpressed representations during the course of negotiations. Opp. at 1.

■ Bayer overstates California law's restrictions on witness testimony as to a contract's meaning under the objective theory of contracts. Bayer seeks to exclude these witnesses' testimony based on their admissions at some point in their depositions that they did not recall "specific discussions" during the course of negotiations as to the meaning of certain specific words in the contract. *See* Mot. at 2–3 (citing portions of Renton depo.); *id.* at 4 (citing portions of McCormick depo.); *id.* (citing portions of Jones depo.). However, contrary to Bayer's implication, these admissions do not amount to any broad concession that these witnesses remember nothing from the negotiations that would inform their memory of and testimony as to the parties' expressed intent. A lack of specific recollection does not change the nature of the testimony, only its weight. None of the cases to which Bayer cites require witnesses to quote from negotiations or provide a detailed account of "specific discussions" in order to testify as to their memory of those negotiations. For example, Bayer cites to *Founding Members of Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal.App.4th 944, 960, 135 Cal.Rptr.2d 505 (2003). However, *Founding Members* does not stand for the broad proposition that all testimony as to a negotiator's understanding of contract terms is inadmissible. Rather, *Founding Members* merely holds that conversations between members of the same side in a negotiation, conversations between those persons and a sales assistant, conversations with undisclosed third parties, and undisclosed statements of individual intent are not relevant under the "objective theory of contracts." *Id.* Other cases on which Bayer relies for support similarly do not discuss or require the specificity it requests that this Court impose. *See Winet v. Price,* 4 Cal.App.4th 1159, 1166, 6 Cal.Rptr.2d 554 (1992) (disregarding "testimony as to what [the witness] subjectively understood and intended the release to encompass"); *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga,* 175 Cal.App.4th 1306, 1339, 96 Cal. Rptr.3d 813 (2009) (affirming exclusion of self-described subjective statement: "I on behalf of Sage Council and Habitat Trust contemplated that the contract purpose of the Settlement Release Agreement (Exhibit 41) was to ...," where the witness "does not indicate that she expressed her asserted intention to anyone before or at the time of contracting" and "her prior language, acts and conduct evidence a contrary intention").

In contrast to these cases and others cited by Bayer, here Onyx's witnesses were present at the negotiations and contend their understanding of the meaning of contract terms is based on the course of those negotiations. *See, e.g.,* Schenker Decl., Exh. 1 at 98 (excerpt of Renton depo. in which he states that he recalls talking about the definition of a collaboration compound with Bayer and that the "intent" to which he refers is based on "the assurances that Bayer gave us"); *id.,* Exh. 26 at 5 (McCormick's declaration explaining the course of the negotiations in which he participated and his understanding of the contract based on those negotiations); *id.,* Exh. 27 at 2–4 (Jones's declaration explaining the parties' notes and negotiations as to what would constitute a Collaboration Compound). This kind of extrinsic evidence is permitted, and indeed required, under California law. *See Dept. of Indus. Relations v. UI Video Stores, Inc.,* 55 Cal.App.4th 1084, 1094, 64 Cal. Rptr.2d 457 (1997) ("[T]he circumstances surrounding the execution of the contract may be considered in determining the meaning of the language used therein.") (citing Cal.Code Civ. Proc., § 1860); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage and Rigging Co., Inc.,* 69 Cal.2d 33, 39–40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) ("[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties.").

Moreover, while Bayer is correct that courts have excluded evidence of the unexpressed *intent* of the parties, other courts applying California law have allowed witnesses to testify about their *understanding* of a contract when that understanding is not simply a private interpretation, but rather is founded in personal knowledge of the negotiations and the parties' expressed intent. *See First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust,* 631 F.3d 1058, 1068 (9th Cir.2011) (witness testified as to "his un-derstanding of the 'subject only to approval' clause"); *Mickey Bearman Co. v. John Morrell & Co.,* No. CV–00–05616 CAS (MCX), 2001 WL 36097432, at *3, 2001 U.S. Dist. LEXIS 26233, at *6–7 (C.D.Cal. Oct. 29, 2001) (attorney "who participated in the negotiations of the [contract], is entitled to testify as to what he, as a representative of [Defendant], thought the ambiguous terms meant."); *ASP Properties Group v. Fard, Inc.,* 133 Cal.App.4th 1257, 1271, 35 Cal.Rptr.3d 343 (2005) ("When [Defendant's negotiator] was asked whether he understood at the time of negotiating the Amendment [that] Tenant would be required to improve the Premises, he answered, 'Absolutely not.' "); *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 39, 69 Cal.Rptr. 561, 442 P.2d 641 (1968) (offering, as example of circumstance warranting extrinsic evidence, situations in which "the parties' understanding of the words used may have differed from the judge's understanding" and requiring the court to consider evidence that would place it "in the same situation in which the parties found themselves at the time of contracting"); *Wolf v. Superior Court,* 114 Cal.App.4th 1343, 1359–60, 8 Cal.Rptr.3d 649 (2004) (finding triable issue of fact and lamenting the fact that "neither side presented any direct or objective evidence regarding the negotiating parties' understanding of the term 'gross receipts' at the time the parties entered into the contract.").

The Court cannot discern any requirement that testimony must be supported by specific quotations of the words stated in negotiation. Rather, California case law merely stands for the proposition that a negotiator's testimony as to contract terms must be grounded in some foundation of personal knowledge as to the parties' expressed intent and understanding during the course of negotiations, rather than

simply the witness's own subjective interpretation of the contract or intent as to what the contract should mean. *See, e.g., Hoopes v. Dolan,* 168 Cal.App.4th 146, 151, 85 Cal.Rptr.3d 337 (2008) ("The real estate agent said she conducted the lease negotiations with Hoopes, and that the issue of parking 'never came up' during those negotiations."). While Bayer is certainly free to impeach the memory and credibility of these witnesses with their own deposition statements that they lacked specific recall of what was stated in the negotiations as to various contract terms, these weaknesses in their testimony are not sufficient to render them inadmissible.

Accordingly, Bayer's motion is DENIED as to this point, without prejudice to Bayer's objections at trial if certain portions of the witnesses' testimony are in fact based solely on their subjective, unexpressed intent.

### 2. Evidence of Bayer's Allegedly Improper Conduct Beyond CRC–KRAS & Breast AI

Bayer seeks to preclude Onyx from introducing testimony with regard to Bayer's other allegedly improper conduct in the course of developing Nexavar in indications beyond CRC–KRAS and Breast AI, as Onyx has not claimed compensatory damages with respect to that conduct. *See* Mot. at 1. Bayer argues that such evidence is irrelevant under Rule 402, prejudicial under Rule 403, and inadmissible character evidence under Rule 404(b).

At oral argument, Onyx agreed to drop four of the five indications and trials at issue—pulmonary arterial hypertension ("PAH"); gastrointestinal stromal tumor ("GIST"); thyroid cancer; and breast cancer in combination with the chemotherapy agent capecitabine ("Breast Cape"). Thus, the Court only considers the parties' arguments regarding 1st line colorectal cancer ("CRC").

With respect to relevance, Bayer contends that evidence of Bayer's alleged efforts to block Nexavar's development in CRC is irrelevant because Onyx does not claim any damages from this conduct, and the fact of damages is a necessary component of Onyx's claims for breach of contract and breach of fiduciary duty. *See* Mot. at 6. But as the Court pointed out at the hearing, the alleged conduct as to 1st line CRC, if proven to be part of a larger campaign to promote DAST and undermine Nexavar, is probative to Bayer's motive and conduct vis-a-vis the blocking of Nexavar trials for which damages are sought. As Onyx noted, both provisions of § 3.6 arguably import (at least the jury may so find) motive as an element of the breach claims. Section 3.6 makes Bayer's motive for blocking Nexavar relevant to whether it has breached the contract because if Bayer blocked Nexavar for legitimate business reasons and in good faith, there is no violation of § 3.6. These documents are also relevant not just to show Bayer's "motive" to breach, but as direct evidence of its alleged bad faith generally in violation of the implied covenant of good faith and fair dealing. *See Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 772, 128 P.2d 665 (1942) ("In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). In addition, as discussed above, Bayer's argument against offering evidence of motive is, at the least, inapplicable to Onyx's tort-based claims.

Even assuming Bayer is correct that this conduct would be irrelevant for Onyx's damages claims, Bayer neglects to address Onyx's remaining claims, including a claim for declaratory relief in the form of "a declaration that Bayer cannot allow its products outside the Collaboration to prej-

udice the development of Nexavar." Joint Pretrial Statement, Docket No. 142, at 7. While Bayer seems to argue in reply that declaratory relief requires proof of damages as well, *see* Reply at 8, such an argument runs directly counter to the provisions of both the California and federal declaratory judgment statutes. *See* Cal. Code Civ. Pro. § 1060 ("[T]he court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time.... The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."); 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").[1]

In addition, because Onyx will seek to show that Bayer's conduct is sufficiently outrageous to warrant punitive damages, evidence of the scope of Bayer's allegedly wrongful conduct is relevant to such a claim. Bayer points to the general and undisputed requirement that punitive damages must bear some relationship to compensatory damages as support for its position that evidence of Bayer's other alleged wrongdoing cannot support punitive damages. *See* Reply at 9 (citing *O'Neil v. Spillane,* 45 Cal.App.3d 147, 161, 119 Cal. Rptr. 245 (1975)); *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 580, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Bains LLC v. Arco Prods. Co.,* 405 F.3d 764, 776–77 (9th Cir. 2005); *Lew Wenzel & Co. of S. Cal., Inc. v. London Litho Supply Co.,* 563 F.2d 1367, 1368 (9th Cir.1977). However, these cases do not stand for the broad proposition that only evidence which is attached to a specific compensatory damages claim is relevant

to a claim for punitive damages. Rather, these cases merely discuss the difficulty of awarding punitive damages when the plaintiff has suffered no compensable harm whatsoever, or when the amount of damages is out of proportion to the amount of compensatory damages. This does not answer the question of whether evidence for which the plaintiff does not claim damages may nonetheless inform a jury's determination of whether the defendant's conduct is worthy of punitive damages.

Indeed, on this question, *BMW* indicates that evidence that does not go directly to compensatory damages is nonetheless relevant and admissible. In *BMW,* the Supreme Court explicitly noted that conduct which could not form the basis of a punitive damages award—BMW's out-of-state conduct which was not unlawful in those states—was nonetheless relevant. *See BMW,* 517 U.S. at 574 n. 21, 116 S.Ct. 1589 ("Of course, the fact that the Alabama Supreme Court correctly concluded that it was error for the jury to use the number of sales in other States as a multiplier in computing the amount of its punitive sanction does not mean that evidence describing out-of-state transactions is irrelevant in a case of this kind. To the contrary, as we stated in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462, n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), such evidence may be relevant to the determination of the degree of reprehensibility of the defendant's conduct."). The Court also considered evidence of potential harm. *Id.* at 575, 581–82, 116 S.Ct. 1589. Bayer can thus point to no case that suggests that each specific example of wrongdoing must be attached to a compensable damages claim in order to be relevant to its claim that Bayer breached its

---

1. Indeed, the cases Bayer cites in support of such a proposition do not even discuss declar-       atory relief.

fiduciary duties and should pay punitive damages for its conduct.[2]

Accordingly, Bayer has failed to demonstrate that this evidence is irrelevant. *See* Fed.R.Evid. 401 (defining relevant evidence broadly to include any testimony "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Bayer also contends that this evidence would be prejudicial under Rule 403, and should be excluded on that basis. However, given its relevance as noted above, Bayer has failed to demonstrate that the prejudicial result from its introduction would substantially outweigh its probative value. Fed.R.Evid. 403. Bayer asserts that this evidence would distract and mislead the jury, and lead to a series of mini-trials. However, Onyx has alleviated most of these concerns by eliminating most of the indications at issue. In addition, the fact that Bayer will need to put on additional witnesses to explain and defend its conduct with respect to the same plaintiff, under the same contract, does not lead to the kind of prejudice or potential confusion that substantially outweighs the probative value of this evidence. *Cf. Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 690 (9th Cir.2001) (in sexual harassment case, finding that the exclusion of evidence regarding complaints by other, non-plaintiff employees years prior to the conduct at issue in that action was not an abuse of discretion). The evidence is admissible under 403.

Finally, Bayer argues that this evidence is inadmissible character evidence under Rule 404(b), which prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." The Court is not persuaded. As with its arguments discussed above, here Bayer ignores Onyx's non-damages claims, for which evidence of Bayer's alleged blocking of Nexavar in other indications is not "other crimes, wrongs, or acts," but rather is part of the same conduct Onyx challenges here and against which it seeks declaratory and punitive relief. Moreover, Rule 404(b) allows for such character evidence where it may show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." While Bayer is correct that motive is not relevant in an action seeking contract damages, *see Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 516, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994), Onyx has asserted tort claims as well as contract claims in this action, and as explained at the hearing, Bayer's motive is relevant to a claim sounding in tort.[3]

---

**2.** Bayer's analysis of *Bradbury*, originally cited by Onyx, is similarly flawed. *See* Reply at 9 (citing *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987)). Bayer seeks to distinguish *Bradbury* based on the fact that the prior conduct at issue in that case—which the court found admissible to show the absence of mistake or accident—had resulted in compensable damages. Yet *Bradbury's* analysis does not turn on the fact that the defendant had paid damages to past complainants. Indeed, such a claim is nonsensical because the current plaintiff was not asserting any right to, or harm from, those previous acts. Thus, such conduct was admissible despite the fact that it did not direct-ly support any damage claim or independent cause of action by the plaintiff. Rather, the key to the dispute was that the defendant had engaged in other, relevant bad acts, regardless of whether each of those acts were legally cognizable claims, that indicated a pattern of bad conduct sufficient to justify punitive damages.

**3.** In its reply, Bayer makes the cursory argument that all of Onyx's claims actually sound in contract, and that therefore its tort claims are not viable. *See* Reply at 11 and n. 4. However, Bayer has not moved for, nor has the Court granted, dismissal or summary judgment on this basis. Thus, the fact is that Onyx's tort claims remain in the litigation;

Accordingly, the Court DENIES without prejudice Bayer's motion to exclude evidence of its alleged efforts to block Nexavar's development in trials other than Breast AI and CRC–KRAS.

### 3. *Evidence Relating to Othello*

Bayer seeks to exclude any documents related to Project Othello, its internal codename for discussions about its potential acquisition of Onyx in 2009. Mot. at 8. Bayer argues that these documents are irrelevant because Bayer never acquired Onyx, and prejudicial under Rule 403.

█ Given the content of these documents—which include admissions that Onyx may use to seek to rebut numerous positions Bayer is taking in this litigation—Bayer has failed to demonstrate that they are irrelevant or substantially more prejudicial than probative. As Onyx points out, *see* Opp. at 16–17, the fact that Bayer never acquired Onyx does not negate the relevance of its discussions to this litigation, as those discussions concerned the relationship and acknowledged potential conflicts between DAST and Nexavar, Bayer's obligations under the contract, and Bayer's ongoing relationship with Onyx. *See, e.g.,* Trial Exh. 384 at –082–83, (indicating that the "[c]ommercial value of DAST is limited by Onyx partnership" and that DAST is in "direct competition with Nexavar" and has "very similar molecular structure"); Trial Exh. 397 (evaluating economic effects of developing DAST for certain indications instead of Nexavar); Trial Exh. 416 (discussing options for switching certain Nexavar trials to DAST); Trial Exh. 440 (discussing benefits of developing DAST over Nexavar in certain indications). This evidence is probative of

Bayer's knowledge and thus its potential motives irrespective of the fact that it ultimately did not acquire Onyx.

Finally, as with the evidence discussed above in the second motion in limine, here Bayer has failed to demonstrate prejudice that would substantially outweigh the probative value of these documents as a whole. Again, Bayer assumes that this litigation solely involves a claim for breach of contract. *See* Reply at 14. Though the Court need not determine whether this evidence would be admissible if only contract claims were asserted, because bad faith and breach of fiduciary duty are at issue here, this evidence is sufficiently probative—notwithstanding its potential damaging effect on Bayer—to bring it outside the confines of 403.

Bayer's motion to exclude these documents is DENIED without prejudice to more tailored objections on a case-by-case basis.

### 4. *Evidence of Damages*

Bayer seeks to exclude any testimony from Onyx's damages expert, Iain Cockburn, as to Onyx's claimed damages from lost profits due to Bayer's alleged blocking of Nexavar's development in Breast AI and CRC–KRAS indications. Mot. at 11. Bayer argues that Cockburn's testimony cannot establish that Onyx suffered damages with reasonable certainty, as is required under California law. *See Vestar Development II, LLC v. General Dynamics Corp.,* 249 F.3d 958, 961 (9th Cir.2001) ("It has long been settled in California that 'the proof must establish with reasonable certainty and probability that damages will result in the future to the person

---

Bayer's cursory challenge to their viability at this late hour is unpersuasive. Similarly, Bayer appears to suggest that because the parties dispute whether a fiduciary duty exists, Onyx should be precluded from introduc-

ing evidence that might tend to show breach of such a duty. *See* Reply at 11 n. 4. This argument is meritless because it presumes Bayer will prevail on a disputed issue.

wronged.'") (quoting *Caminetti v. Man-ierre,* 23 Cal.2d 94, 101, 142 P.2d 741, 745 (1943) (in bank)).

Bayer's arguments are nearly identical to those it raised in its motion for summary judgment, which Judge Patel denied. Indeed, much of Bayer's motion appears to have been cut and pasted from its earlier summary judgment motion. In her order, Judge Patel rejected Bayer's assertion that a 57% percent chance of FDA approval is insufficient to qualify as "reasonably certain." *See* Memorandum & Order, Docket No. 143, at 20. She found that "Onyx has raised at least an issue of fact as to the propriety of its requested damages." *Id.* Bayer has not requested leave to file a motion for reconsideration of that ruling. *See* Civ. L.R. 7–9.

■ Moreover, viewed independently, this Court agrees with Judge Patel's conclusion. Bayer argues that a 57–62% chance of FDA approval is insufficient as a matter of law to create a "reasonable certainty." Mot. at 13. In addition, Bayer contends that Onyx should not be permitted to present evidence of "risk-adjusted damages," which it claims demonstrate that Onyx's damages claims are speculative. *See* Mot. at 15–16. As Onyx has agreed at oral argument not to introduce any evidence of risk-adjusted damages, the Court considers only the reasonable certainty argument.

Bayer can point to no case, nor has Judge Patel or this Court uncovered such a case, in which California courts have mandated a percentage of certainty above 57% in order to constitute "reasonable certainty." *See* Memorandum & Order, Docket No. 143, at 20. Rather, most cases addressing reasonable certainty adhere to a qualitative approach, and the cases Bayer cites do not support the kind of wholesale rejection of evidence that Bayer requests from this Court. For example, as Judge Patel found, the principal

case on which Bayer relies for its assertion that recovering damages for lost profits in pharmaceutical products is "exceedingly difficult," *see AlphaMed Pharm. Corp. v. Arriva Pharm., Inc.,* 432 F.Supp.2d 1319 (S.D.Fla.2006), *aff'd,* 294 Fed.Appx. 501 (11th Cir.2008), is distinguishable on numerous grounds from the instant case. *See* Memorandum & Order at 19 (emphasizing that *AlphaMed,* unlike this case, involved a product that had never been tested, might have been illegal to distribute, and for which it was uncertain whether there was a sufficient research and development budget, among other differences). In another case on which Bayer relies, *Matthews v. Atchison, Topeka & Santa Fe Railway Co.,* 54 Cal.App.2d 549, 560, 129 P.2d 435 (1942), the court was referring to a case in which the court reduced, rather than eliminated, damages to account for their lack of certainty.

Under California law, damages evidence found to be too speculative faced more uncertainty than is present in this case, in which Nexavar has already been approved for two cancer indications and the parties have experience successfully promoting its sale. *See, e.g., Kids' Universe v. In2Labs,* 95 Cal.App.4th 870, 887–888, 116 Cal. Rptr.2d 158 (2002) (finding expert testimony insufficient to demonstrate lost profits where a small toy store claimed that flood damage to the store caused by defendant led to $50 million in lost profits because Plaintiff's new website would have allowed it to compete in the Internet toy marketing business); *Vestar Dev. II, LLC v. Gen. Dynamics Corp.,* 249 F.3d 958, 962 (9th Cir.2001) (finding lost profits claim too speculative for breach of agreement to negotiate where plaintiff sought "future profits that it hoped to earn from the shopping center it had planned to build on the parcel it was attempting to buy"); *Eisenmayer v. Leonardt,* 148 Cal. 596, 601, 84 P. 43 (1906) (affirming exclusion of testimony as

to value of unissued stock for company never formed because there were "no facts stated—either real or hypothetical—as a basis for an intelligent opinion"); *Greenwich S.F., LLC v. Wong*, 190 Cal.App.4th 739, 766, 118 Cal.Rptr.3d 531 (2010) 1 (finding lost profits claim too speculative where the plaintiff assumed, rather than proved, the reasonable certainty of future predicate events upon which the damages depended); *Fisher v. Hampton*, 44 Cal. App.3d 741, 749, 118 Cal.Rptr. 811 (1975) (finding lost profits evidence too speculative where "there was no testimony that any oil could be recovered at a profit from the drilling of one well, and there was no testimony as to the extent of possible profits from the one initial well."); *Boyer v. Wells*, No. B205345, 2008 WL 3984342, at \*8 (Cal.Ct.App. Aug. 29, 2008) ("Blaha's testimony that there are generally unforeseen rebuilding costs was too speculative to require the court to infer that there would be such costs in this case."). In contrast to these cases, courts allow for projections of lost profits for unestablished businesses when those projections are rooted in sound factual and statistical analysis, even though such testimony does not lend itself to absolute certainties with respect to future damages. *See Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 884, 116 Cal.Rptr.2d 158 (2002) ("[I]f the business is a new one or if it is a speculative one . . ., damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like."); *Parlour Enterprises, Inc. v. Kirin Group, Inc.*, 152 Cal.App.4th 281, 288, 61 Cal. Rptr.3d 243 (2007) ("[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a 'substantial and sufficient factual basis' rather than by mere 'speculation and hypothetical situa-

tions.'") (quoting *Kids' Universe*, 95 Cal. App.4th at 885, 116 Cal.Rptr.2d 158); 1 *A & M Produce v. FMC Corp.*, 135 Cal. App.3d 473, 494, 186 Cal.Rptr. 114 (1982) (finding lost profits from destroyed tomato crop, which plaintiff had never grown before, proven to reasonable certainty where plaintiff "1 provide[d] evidence regarding the size of the crop and general market price for that type of tomato, the fact that he was an experienced farmer, the condition of the tomatoes pre-harvest, and the fact that there was no indication anything else would have ruined the crop had the machine functioned properly"); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1176 (3d Cir.1993) (finding lost profits from franchisees that never opened proven to reasonable certainty despite the fact that the witness "did not offer any documentary evidence comparing his operation to those of his competitors, did not discuss the market conditions for quick-lube centers generally, did not assess the impact of the stock market crash of 1987 on the likelihood of whether Lightning Lube would have gone public, and did not consider the impact of the 1990–91 recession on lube sales generally").

Those cases that do attach some mathematical component to the reasonable certainty analysis further support Onyx's view that a probability of greater than 50% is sufficient to create a "reasonable certainty." *See Wagner v. Apex Marine Ship Mgmt. Corp.*, 83 Cal.App.4th 1444, 1452, 100 Cal.Rptr.2d 533 (2000) (discussing the need for a more flexible construction of the statute of limitations in latent disease cases because otherwise "most plaintiffs will be unable to prove that the likelihood of the future illness is "reasonably certain," *i.e.*, greater than 50 percent, as courts generally require [for damages]." ) (quoting *Wilson v. Johns–Manville Sales Corp.*, 684 F.2d 111, 119 (D.C.Cir.1982) ("Recovery of damages for speculative or conjectural future conse-

quences is not permitted. To meet the "reasonably certain" standard, courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur.")); *see also Henderson v. Sheahan,* 196 F.3d 839, 850 (7th Cir. 1999) ("Although the Illinois courts have yet to squarely define the meaning of "reasonable certainty," other jurisdictions have construed it to require a showing that it was more likely than not (*i.e.,* greater than fifty percent probability) that the plaintiff would develop the serious injury in the future [to recover damages].") (citing cases from the Fifth and Sixth Circuits); *Weeks Dredging & Contracting, Inc. v. B. Turecamo Towing Corp.,* 482 F.Supp. 1053, 1058 (E.D.N.Y.1980) (describing reasonably certain lost profits as "what profits more probably than not would have been earned had the incident not transpired"). Bayer contends that *Wagner* is inapposite

because it concerns latent disease in a tort action. However, though not dispositive of the question, *Wagner,* like the instant case, involved analysis of a contingent event that affected the availability of future damages. In *Wagner,* it was latent asbestos-related disease, whereas here, it is FDA approval. Moreover, as Onyx points out, courts have treated tort and contract cases as analogous for purposes of establishing future damages. *See Kids' Universe,* 95 Cal.App.4th at 883, 116 Cal. Rptr.2d 158.

■ At the least, then, California law provides no indication that an estimated 57% likelihood of FDA approval cannot satisfy the reasonable certainty requirement. Moreover, as Judge Patel noted, Onyx has pointed out that 57% is a low bar in this case, as it estimates an 80% likelihood that at least one of the indications will succeed.[4] *See* Memorandum & Order

---

4. In its summary judgment briefing, Bayer argued that Onyx had to prove each source of damages—the Breast AI and the CRC—separately, and therefore that it could not use the combined 80% probability of one indication receiving approval to establish reasonable certainty. *See* Reply ISO MSJ, Docket No. 106, at 13 n.11. However, California law is clear that a party must only prove *the fact of damages* to a reasonable certainty; it does not mandate that a party prove each individual source of damages separately, as long as all of those sources stem from the defendant. *Israel v. Campbell,* 163 Cal.App.2d 806, 816, 330 P.2d 83 (Cal.App.1958) (discussing difficulty of awarding damages when some damages may have been caused by defendant and others may not be defendant's responsibility, but finding that problem did not apply where "[r]espondent's damages came from only one source, namely, appellant's default"); *see also Guntert & Zimmerman Const. Div., Inc. v. S.G.M.E. Usine Moser S.A.,* No. C–88–3866, 1992 WL 12602677, at *4 (N.D.Cal. June 3, 1992) ("Although certainty as to the fact of damages must exist, a more liberal rule is applied in determining the amount of the damages."). Thus, if Onyx is able to present evidence at trial sufficient to demonstrate

with reasonable certainty that one of the indications would succeed, whether it can prove that both would succeed goes more to the amount, rather than the existence, of damages. For those determinations, California uses a liberal evidentiary rule. *Grupe v. Glick,* 26 Cal.2d 680, 691–93, 160 P.2d 832 (Cal.1945); *California Lettuce Growers v. Union Sugar Co.,* 45 Cal.2d 474, 486–87, 289 P.2d 785 (1955) ("[W]hen it clearly appears that a party has suffered damage a liberal rule should be applied in allowing a court or jury to determine the amount, and that, given proof of damage, uncertainty as to the exact amount is no reason for denying all recovery.") (quotation omitted); *Hunt Foods, Inc. v. Phillips,* 248 F.2d 23, 33 (9th Cir.1957) (restating California rule); *Dillingham–Ray Wilson v. City of Los Angeles,* 182 Cal.App.4th 1396, 1406, 106 Cal.Rptr.3d 691 (2010) (same); *see also Macken v. Martinez,* 214 Cal. App.2d 784, 790, 29 Cal.Rptr. 867 (1963) ("As defendant's wrongful conduct made the exact ascertainment of damages difficult, he cannot complain because the court must make an estimate of the damage and not an exact computation, provided, of course, that the estimate is a reasonable one."); *McConnell v. Corona City Water Co.,* 149 Cal. 60, 66, 85 P.

at 20 (citing Onyx Opp. to MSJ, Docket No. 96, at 24). Accordingly, the Court cannot conclude that Onyx's expert testimony is insufficient as a matter of law to demonstrate damages with reasonable certainty. Bayer's motion is denied.

### III. *WITNESSES*

A witness or exhibit not listed in a party's pretrial conference statement may not be called or used without good cause. This rule does not apply to true rebuttal witnesses (other than experts). Defense witnesses are normally considered case-in-chief witnesses, not "rebuttal" witnesses.

The parties shall file their final witness lists by noon, September 30, 2011.

### IV. *EXPERT REPORTS*

The parties shall lodge all expert reports, including their supplemental expert reports, with the Court no later than Wednesday, September 28, 2011.

### V. *EXHIBITS*

Attached to this order as Exhibit A, the Court provides its rulings on Onyx's representative exhibits to which Bayer objects. Attached as Exhibit B, the Court provides its rulings on Bayer's representative exhibits to which Onyx objects. At the pretrial conference herein, the Court explained the principles it employs in adjudicating relevance and admissibility. The parties are directed to meet and confer and resolve any remaining differences on objections. The parties shall submit a revised narrowed list of exhibits and any remaining objections by September 28, 2011.

### VI. *DEPOSITION DESIGNATIONS*

The Court has considered the parties' representative deposition designations and objections, Docket No. 202. With respect to Bayer's designation number 5, Robert Jones 22:23–23:1, the Court reserves this question for trial as to whether Bayer has laid a sufficient foundation for the necessity of impeachment. With respect to Bayer's designation number 6, Robert Jones 113:25–114:22, the Court reserves the question for trial as it is keyed to Exhibit 1077, for which the Court has tentatively overruled Onyx's hearsay objection subject to a proper foundation at trial. *See* Exhibit B. With respect to all other representative deposition designations, the Court overrules the objections. As with the exhibits, the parties shall meet and confer and resolve objections. The parties shall submit a revised (narrowed) list by September 28, 2011.

### VII. *VOIR DIRE*

Based on the parties' submissions and the Court's general practice, the Court intends to ask the following voir dire questions during jury selection. Counsel will be allowed a brief (20 minutes) follow-up voir dire after the Court's questioning.

1. Name
2. City of residence
3. Occupational Status
4. Organizations
5. Hobbies
6. Marital Status
7. Spouse's occupation
8. Children (including ages).

929 (Cal.1906) ("It is no objection to ... recovery that [damages] cannot be directly and absolutely proved."). "It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party." *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938, 939 (9th Cir.1999) (finding that the court had exercised its discretion appropriately by "considering several possible theories for determining damages" and "declining to award compensation where it felt calculations were impermissibly speculative") (citing *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.*, 1 Cal.3d 586, 599, 83 Cal.Rptr. 418, 463 P.2d 770 (1970)).

9. If a juror on another case

10. If ever a grand juror

11. If ever in the military.

12. Who is (or was) your employer?

    a. How long have you worked (or did you work) for that employer?

13. Please describe your educational background, including where you went to school, your major areas of study, and any degrees you have received.

14. The companies involved in this dispute are Bayer Corporation, Bayer AG, Bayer Healthcare LLC, Bayer Schering Pharma AG, Bayer HealthCare Pharmaceuticals, Inc., Bayer HealthCare Pharmaceuticals LLC (collectively referred to here as "Bayer") and Onyx Pharmaceuticals, Inc. (referred to here as "Onyx").

    a. Other than in reference to the product Bayer Aspirin, have you ever heard of Bayer?

    b. Have you ever heard of Onyx?

    c. Have you, any member of your family, or any of your close friends ever worked for Bayer or Onyx or had any business relationship with Bayer or Onyx? Identify the person and explain.

    d. Have you or any member of your immediate family ever owned any stock, bond, or ever had any financial interest in Bayer or Onyx?

15. The law firms representing the parties involved in this dispute are Cooley LLP (formerly known as Cooley Godward and Cooley Godward Kronish), Morrison & Foerster LLP and Bartlit Beck Herman Palenchar & Scott LLP. Some of the specific attorneys involved are:

    From the law firm of Bartlit Beck Herman Palenchar & Scott LLP:

    Phil Beck

    Mark Levine Brian Swanson

    Scott McBride

    From the law firm of Morrison & Foerster:

    Alison Tucher From Bayer:

    Scott Meece

    From the law firm of Cooley LLP:

    Stephen C. Neal

    Martin S. Schenker

    Michelle S. Rhyu

    Benjamin Kleine

    From Onyx:

    Suzanne Shema

16. Do you have any college education, training, experience, or current or past employment in the following areas?

    (1) Pharmaceuticals

    (2) Medicine or healthcare

    (3) Biotechnology

    (4) Drug Discovery or Development

    (5) Chemistry including Medicinal Chemistry and Chemical Engineering

    (6) Biology

17. The products that will be discussed in this case are cancer-fighting drugs.

    (A) Have you, a family member or a close friend ever had cancer?

    (B) Have you, a family member or a close friend ever taken the medication Nexavar®?

18. Do you have any personal experience or training specifically involving the drafting or review of contracts, or dealing with a dispute over the terms of a contract, either in connection with your job or as part of your personal life?

19. Have you or an immediate family member ever started a business?

20. Do you have any personal knowledge of this case, or have you read about or heard it discussed, or have an opinion regarding it?

21. Have you or any member of your immediate family ever been a party to a lawsuit? Please describe.
    a. Were you the plaintiff or defendant?
    b. How was the case resolved?
    c. Will your experiences from that lawsuit impact your ability to decide this case in a fair and impartial way?
22. Are you or any member of your family an attorney or law student?
23. The following is a list of individuals who might appear as a witness in this case. Are you related to or personally acquainted with any of these individuals?
    1. Lila Adnane
    2. Shripad Bhagwat
    3. Hans Bishop
    4. Klaus Brandau
    5. Gideon Bollag
    6. Laura Brege
    7. Iain Cockburn
    8. N. Anthony Coles, Jr.
    9. Jacques Dumas
    10. Axel Eble
    11. Henry (Hank) Fuchs
    12. Mark Gelder
    13. Greg Giotta
    14. Arthur Higgins
    15. Bob Jones
    16. Juergen Lasowski
    17. Christopher Lipinski
    18. Nathalie Lokker
    19. Ted Love
    20. Tim Lowinger
    21. John Lyons
    22. Kemal Malik
    23. Bob Mass
    24. Frank McCormick
    25. Joerg Moeller
    26. Chris Peetz
    27. Wolfgang Plischke
    28. Len Post
    29. Paolo Pucci
    30. Mohan Rao
    31. Hollings Renton
    32. Bernd Riedl
    33. Rob Rosen
    34. Eric Rowinsky
    35. Peter Sandor
    36. Bill Scott
    37. Scott Wilhelm
    38. Todd Yancey

24. Do you have any other experience, opinion, or matter which you believe should be called to the Court's or the parties' attention that might have some bearing on your qualifications or ability to sit as a juror on this case, or which you think may prevent you from rendering a fair and impartial verdict based solely upon the evidence and the Judge's instructions as to the law?

25. Have you ever been involved in a serious business dispute? Briefly describe the nature of the dispute and how it was resolved.

## VIII. *JURY INSTRUCTIONS & VERDICT FORM*

The Court shall address the verdict form at a subsequent date.

Regarding instructions, as the Court noted at the pretrial conference, the parties are directed to meet and confer and try to reach an agreement on the instructions. The parties shall file with the Court no later than noon Friday, September 23, 2011, a set of agreed upon instructions and the parties' respective positions and proposed language where they disagree.

In addition to the above, the parties shall provide the Court with any stipulated facts to be read to the jury, to be filed on

September 23, 2011, along with the jury instructions.

    IT IS SO ORDERED.

**PRETRIAL CONFERENCE ORDER**
**EXHIBIT A—ONYX EXHIBITS**
**WITH BAYER OBJECTIONS**

| # | Exh. # | Description | Onyx Statement of Relevance | Bayer Objection | Onyx Response to Objections | Court's Ruling* |
|---|---|---|---|---|---|---|
| 1 | 185 | Nexavar Launch Video 004 (native video) | This video, prepared jointly by Onyx and Bayer, contains statements by Onyx and Bayer scientists and physicians regarding the discovery and development of Nexavar, including statements on technical issues relating to the "recognition" that DAST met the Exhibit D standard (which is relevant to the Collaboration Compound dispute) and concerning the adverse effect profile of Nexavar (which is relevant to Onyx's claims under § 3.6 of the Collaboration Agreement). | 802; 805 | Bayer's statements are party-opponent admissions and are therefore not hearsay. Bayer endorsed the statements by Onyx and third parties, which were also made in the regular course of business. | Overruled |
| 2 | 219 | Email from P. Pucci to A. Busch et al. re: Re: Sorafenib -- Relief For Many Sufferers of Pulmonary Hypertensio n | This exhibit demonstrates Bayer's competing interests in Nexavar and DAST in the context of the development of Nexavar for treatment of pulmonary hypertension (also known as "PAH") (*See also* Onyx's Opposition to Bayer's Motion in Limine.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3 | 315 | Nexavar in PAH - Recommended Path Forward Presentation | This exhibit reveals Bayer's concern with allowing Nexavar development in PAH due to the risk of creating a competitor to DAST. (*See also* Onyx's Opposition to Bayer's Motion in Limine.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |
| 4 | 365 | Email from R. Rosen to H. Bishop et al. re: EC Alignment-Please Read | This internal Bayer document shows that Bayer oncology personnel initially were prepared to support the development of Nexavar in 2nd line CRC-KRAS. After Bayer decided to develop DAST in CRC, and performed calculations showing that it would realize greater profits from developing DAST in CRC, Bayer refused to authorize the Nexavar trial in CRC KRAS. | 402; 403 | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |
| 5 | 384 | Oncology Strategy - BoM Presentation | As explained in detail in Onyx's opposition to Bayer's Motion in Limine (at 11-15), this exhibit contains numerous highly relevant facts that contradict Bayer positions. (*See also* Onyx's Opposition to Bayer's Motion in Limine at 11-17.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| 6 | 397 | Spreadsheet Model re: General Project Information for DAST | This exhibit contains Bayer's economic modeling of various development options for DAST. It reveals, among other things, that DAST and Nexavar would "cannibalize" one another if both drugs were developed in the same indications and that Bayer would potentially earn hundreds of millions of dollars of additional profits if it developed DAST, rather than Nexavar, as a treatment for CRC. (*See also* Onyx's Opposition to Bayer's Motion in Limine at 11-17.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |
| 7 | 416 | Email from P. Sandor to R. Rosen et al. re: DAST vs. NXV | This internal document circulated among Bayer's senior oncology team reveals that Bayer reached a decision to develop DAST extensively by mid –January, less than one week before Onyx proposed its Phase 3 trials of Nexavar in CRC KRAS and Breast AI. The email chain also contains a discussion of Bayer's "switching strategy," which is highly relevant for the reasons discussed in Onyx's Opposition to Bayer's Motion in Limine. (*See also* Onyx's Opposition to Bayer's Motion in Limine at 17-19.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| 8 | 439 | Email from L. Adnane to B. Lu et al. re: DAST MOA | This exhibit contains statements from Bayer scientists concerning their recognition that Nexavar and DAST inhibit cancer through the same mechanism of action, and evidences Bayer's knowledge that DAST would compete directly with Nexavar. | 602 | This is an internal e-mail between Bayer personnel, produced from Bayer's files. Rule 602 does not preclude the admission into evidence of this internal Bayer document. | Overruled |
|---|---|---|---|---|---|---|
| 9 | 440 | DAST in Development Scenarios – Assumptions and Results Presentation | This exhibit presents Bayer's economic modeling showing that developing DAST in competition to Nexavar was far more profitable than limiting DAST to indications in which Nexavar was not being developed. It also establishes that an even more profitable option for Bayer than developing DAST and Nexavar in competing indications would be for Bayer to block Nexavar development in any indication in which Bayer planned to develop DAST. (*See also* Onyx's Opposition to Bayer's Motion in Limine at 11-19.) | 402; 403; 602; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| 10 | 497 | Email from T. Coles to A. Fibig et al. re: DAST | This exhibit shows that Onyx asked Bayer about the structure of DAST in March 2009. In response, Bayer disclosed the structure to Onyx. The timing of this disclosure is relevant to Bayer's statute of limitations and laches defenses. | 802 | Qualifies for business records exception. | Overruled |
|----|-----|------|------|------|------|------|
| 11 | 503 | Email from B. Flannelly to T. Coles et al. re: CRC 1st Line | This exhibit demonstrates that Bayer blocked Nexavar's development as a first line treatment for colorectal cancer. Onyx explained the relevance of Bayer's strong arm tactics disclosed in its document in its opposition to Bayer's Motion in Limine. (*See* Onyx's Opposition to Bayer's Motion in Limine at 8-9.) | 402; 802; 805; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. Qualifies for business records exception to hearsay. In addition, Bayer's statements are party-opponent admissions. | Overruled |

| 12 | 506 | Email from H. Bishop to R. Rosen et al. re: CRC 1st Line | This exhibit, an internal Bayer e-mail, describes Bayer's opposition to Onyx's proposal to pursue a clinical trial of Nexavar in CRC. Among other things, the e-mail includes the statement that "we also need to keep in mind that it [i.e., CRC] is most likely a place where we would put DAST which make [sic] the issue more convoluted." The relevance of this evidence is discussed in greater length in Onyx's opposition to Bayer's Motion in Limine (*See* Onyx's Opposition to Bayer's Motion in Limine at 8-9.) | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |
| 13 | 509 | Email from A. Wagner to B. Lu et al. re: ITOG | This exhibit demonstratives Bayer's desire to keep secret its competing interests in DAST as of March 2009 and to steer key opinion leaders to DAST, and away from Nexavar. | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| 14 | 539 | Email from J. Lasowski to T. Coles et al. re: Ardea | This exhibits underscores the different approaches to the collaboration exhibited by the two parties and the role of DAST in coloring Bayer's conduct towards Onyx. In this exhibit, Onyx invited Bayer to join Onyx in evaluating a possible joint transaction involving Ardea, a company developing a drug that held promise as a combination partner for Nexavar. Bayer ignored Onyx's invitation, pursued secret discussions with Ardea, culminating in an exclusive license agreement, and is now planning combination trials with Ardea's drug and DAST. | 402; 403; 802; subject of MIL | Onyx's proposal to Bayer to pursue a joint business transaction is a business record and not hearsay. Moreover, the exhibit was offered to demonstrate that Onyx made its proposal. | Overruled |
| --- | --- | --- | --- | --- | --- | --- |
| 15 | 540 | Email from H. Bishop to A. Higgins, cc: A. Fibig re: Onyx/Tony Coles | This exhibit contains Onyx's reaction to the announcement that Bayer had entered into an agreement with Ardea that excluded Onyx, followed by an internal Bayer e-mail admitting that Bayer's "aspirations for this molecule go beyond Nexavar." | 402; 403; subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

| 16 | 838 | Email from B. Flannelly to J. Lasowski et al. re: Bayer and Ardea BioSciences Announcement | This exhibit contains Bayer's notification to Onyx, made six months after Onyx's original invitation to pursue a joint transaction, that Bayer had entered into an exclusive license agreement with Ardea, along with a cover note from the recipient to Onyx management notifying them of Bayer's disclosure. | 402; 403; 802 | Not hearsay since offered to show Bayer email received by Onyx. | Overruled |
|----|-----|-----|-----|-----|-----|-----|
| 17 | 867 | Minutes of the Bayer Schering Pharma AG Board of Management Meeting (BoM) 01/09 | This document provides the minutes of the meeting at which the Oncology Strategy Project slides were presented to Bayer management and provides the best evidence of the date on which the meeting took place. It is therefore relevant and probative to Onyx's claims of breach of § 3.6 of the Collaboration Agreement. | 402; 403; Subject of MIL | The document is relevant and probative to Onyx's § 3.6 claim. Any risk of prejudice, confusion, or waste of time does not "substantially outweigh" the probative value of the document. | Overruled |

*All objections that are overruled are without prejudice as to lack of foundation (*e.g.*, business records). Evidence to which objections are overruled is still subject to foundation requirements.

**PRETRIAL CONFERENCE ORDER EXHIBIT B - BAYER EXHIBITS WITH ONYX OBJECTIONS**

| # | Exh. # | Description | Bayer Statement of Relevance | Onyx Objection | Bayer Response to Onyx's Objection | Ruling |
|---|--------|-------------|------------------------------|----------------|-------------------------------------|--------|
| 1 | Exh. 1048 | Onyx Privilege Log | Shows Onyx's knowledge of DAST and its actions in response to that knowledge | 501, 802, Cal Code Evid 913 | Privilege log is by definition not privileged, it's a 801(d)(2) party admission, and California evidence rules don't apply to federal court proceeding. Even if it did, not seeking any inference about the privileged actions, merely the existence of the communications about the subjects listed. | Sustained |
| 2 | Exh. 1053 | Spreadsheet R&D project costs | Data from Bayer's files showing how much Bayer spent 2007-2011 for development of DAST. | 802 | It is an 803(6) business record. This is an output of specific financial data kept in the ordinary course of business by Bayer in an electronic database. | Overruled |
| 3 | Exh. 1070 | Onyx Q4 2010 Earnings Conf call | Transcript of Onyx's statements shows its characterization of the development of Nexavar as well as its other pipeline drugs. | 802 | It is an 801(d)(2) party admission. | Overruled |

| 4 | Exh. 1071 | 4/26/06 Post email to Renton re: Other indications | Onyx internal email shows its position regarding both parties potential interest in developing drugs in indications that might also be available for Nexavar, and how Bayer and Onyx's interests might diverge. | 403 | Onyx improperly claims prejudice for a document based on the fact that it helps prove Bayer's case  There is no prejudice evident from Onyx's Senior VP of R&D discussing his understanding of how Bayer and Onyx's interests in development for Nexavar and other compounds might align. | Overruled |
|---|---|---|---|---|---|---|
| 5 | Exh. 1077 | 1/25-26/94 meeting minutes between Onyx and Bayer/Miles | Contemporaneous memo that documents negotiations of Collaboration Agreement | 802 | It is an 803(6) business record, it contains 801(d)(2) party admissions of Onyx during negotiations, and the Bayer statements contained within provide necessary context for Onyx's admissions. Deposition testimony from Klaus Brandau supports that the author of the minutes had the responsibility for taking meeting notes and subsequently turning them into minutes. | Overruled |
| 6 | Exh. 1102 | 4/3/09 Bishop email to Coles re: DAST | Bayer email to Onyx reflects consistent belief that DAST is not a collaboration compound. | 802 | It is an 803(6) business record and it contains both 801(d)(2) Onyx party admissions and also context for understanding those admissions. | Overruled |

| 7 | Exh. 1121 | 11/25/09 Rhyu letter to Swanson re: Discovery Issues | Letter from Onyx's lawyer containing Onyx's position regarding its interpretation of section 3.6 | 402 | Section 3.6 is a disputed section in this case and evidence relating to Onyx's interpretation of that section is probative of that dispute. | Sustained |
|---|---|---|---|---|---|---|
| 8 | Exh. 1127 | 9/21/05 Schenker email string to Quigley re: Revised Draft Co-Promotion Agreement | It relates to Bayer/Onyx negotiations of an amendment to Collaboration Agreement. | 402, 403, 802 | It is an 801(d)(2) party admission. Any potential prejudice from redactions can be cured by Court's instruction to jury on privilege, if necessary. | Sustained |
| 9 | Exh. 1137 | 11/12/93 Bayer/Onyx meeting minutes | This documents negotiations of Collaboration Agreement. | 802 | It is an 803(6) business record, it contains 801(d)(2) party admissions of Onyx during negotiations, and the Bayer statements contained within provide necessary context for Onyx's admissions. Deposition testimony from Klaus Brandau supports that the author of the minutes had the responsibility for taking meeting notes and subsequently turning them into minutes. | Overruled |

| 10 | Exh. 1151 | 7/29/93 Onyx BOD meeting minutes | It reflects Onyx update to its board of directors on status of negotiation of the Collaboration Agreement in July 1993. | 402, 403 | There's no evident prejudice associated with Board Minutes, and does not substantially outweigh probative value of evidence that Onyx's Board of Directors discussed negotiations in this time period. | Sustained |
|----|------|------|------|------|------|------|
| 11 | Exh. 1162 | 3/9/11 Turck email to Brege on going forward with AI | Reflects Bayer's notice to Onyx that it would agree to proceed with modified Breast AI study. | 802 | It is an 803(6) business record of Bayer/Onyx dealings, and it is necessary context for Onyx 801(d)(2) party admissions regarding the Breast AI study. | Overruled |
| 12 | Exh. 1193 | 9/6/01 Shimei fax/letter to Giotta re: Pho Kinase Inhibitor Bay 60-8829 | Reflects Bayer and Onyx dealing with prior disputes over whether compounds are Collaboration Compounds, showing Onyx's awareness of the issue yet failure to take action in 2005. This is relevant to the laches defense, as well as contract interpretation. | 802 | It is an 803(6) business record of Bayer/Onyx dealings in the Collaboration. | Overruled |

| | | | | | | |
|---|---|---|---|---|---|---|
| 13 | Exh. 1198 | 12/8/05 conference call transcript re: Bayer R&D Investor Day 2005 | Reflects Bayer public statements about DAST development, which Onyx representatives admitted that they heard. Onyx's lack of action following this call is relevant to the laches defense as well as contract interpretation. | 802 | It is an 803(6) business record. It may also not be used for the truth of the matter asserted (DAST development plans), but rather as evidence that Bayer made the statements contained within the document about DAST, and that Onyx witnesses to the conference call heard those statements regarding DAST. | Overruled |
| 14 | Exh. 1213 | 3/5/08 Southerton email to Giotta re: status of PD332991 clinical development | Reflects Onyx's development of non-Nexavar drugs for treatment of cancer, including indications that it is also interested in developing Nexavar | 802 | It is an 803(6) business record of Pfizer/Onyx dealings on their joint compound under development. | Sustained |
| 15 | Exh. 1422 | 11/13/09 Swanson letter to Rhyu | This is the letter to which Exh 1121 is responding, and relates to Onyx's interpretation of section 3.6 of the Collaboration Agreement. It is necessary for context and understanding of Onyx's statements in Exh. 1121. | 402 | This is the letter to which Exh 1121 is responding, and relates to Onyx's interpretation of section 3.6 of the Collaboration Agreement. It is necessary for context and understanding of Onyx's statements in Exh. 1121. | Sustained |

| | | | | | | |
|---|---|---|---|---|---|---|
| 16 | Exh. 1549 | 8/12/09 Bishop email to Rosen et al. re: DAST and Nexavar testing (guiding principles for development) | Reflects Bayer internal notice regarding principles for DAST development | 802 | It is an 803(6) business record. | Sustained |
| 17 | Exh. 1592 | 3/28/01 Brocks email string to Busse re: Onyx nonoptioning of co-development | Reflects discussion of Nexavar development and Onyx's plans regarding that development. | 802 | Contains 801(d)(2) party admissions and context for those admissions. Also functions as an 803(6) business record. | Overruled |
| 18 | Exh. 1674 | 1/20/11 presentation: Frontline Aromatase Inhibitor Breast Cancer Business Case Overview | Reflects updates and discussions of Nexavar development in the disputed AI indication. | 802 | It is an 803(6) business record of Bayer/Onyx development discussions, like the many other examples of similar powerpoints in the exhibits for which no objection was leveled. | Overruled |
| 19 | Exh. 1708 | 9/26/07 Malik email string to Moeller re: PAH sorafenib | Reflects discussions of bringing DAST into Collaboration with Onyx. | 403, 802 | Contains 801(d)(2) party admissions of Onyx and context for those admissions. Onyx improperly claims prejudice for a document based on the fact that it helps prove Bayer's case. | Sustained |

| 20 | Exh. 1776 | Urea Spreadhseet. xls & ".DB" file | Spreadsheet of data from Bayer's files of the relevant compositions of matter made and tested by Bayer during the Collaboration and the RKI2 project, including dates of synthesis. | 802 | It is an 803(6) business record. This is an output of specific chemical data kept in the ordinary course of business by Bayer in an electronic database that tracks all chemistry and biology work done at Bayer. | Overruled |
|---|---|---|---|---|---|---|
| 21 | Exh. 1778 | 1/28/10 Breast AI PPT for EC | Reflects issues of Nexavar's development in the disputed AI indication. | 802 | It is an 803(6) business record of Nexavar development, prepared for the joint Executive Committee. It also contains 801(d)(2) Onyx party admissions and context for those admissions. | Overruled |
| 22 | Exh. 1796 | Spreadsheet | Data showing how much Bayer spent 2007-2011 for development of DAST, Nexavar, and all other oncology drugs. | 802, 901 | It is an 803(6) business record. This is an output of specific financial data kept in the ordinary course of business by Bayer in an electronic database. Onyx has no reasonable belief that the document is not authentic given that its format and content is consistent with and corroborated by other similar business records like Exh. 1053 and Exh. 1089 that are outputs from the same database. | Overruled |

| 23 | Exh. 1826 | 4/14/11 Joint Development Committee meeting Agenda and slides | Reflects discussions and presentations on Nexavar development at JDC (both Bayer and Onyx have members), including in indications in dispute in this case | 802 | It is an 803(6) business record of Nexavar development. | Overruled |
|----|-----------|-----------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------|----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-----------|
| 24 | Exh. 1833 | 1/19/05 presentation re: Sorafenib Full Potential "Back of the Envelope" Assessment | Relates to Nexavar development, including issues in disputed indications. | 402, 403 | It is an 803(6) business record. There's no apparent prejudice in the document and it doesn't outweigh its probative value regarding evaluations of potential Nexavar development. Onyx improperly claims prejudice for a document based on the fact that it helps prove Bayer's case. | Overruled |
| 25 | Exh. 1834 | 6/30/08 Post email to Fuchs re: ACT Biotech | Internal Onyx email shows Onyx's knowledge regarding DAST, relevant to the laches defense as well as contract interpretation. | 403 | There is no prejudice associated with Onyx's knowledge of DAST. Onyx improperly claims prejudice for a document based on the fact that it helps prove Bayer's case. Any potential prejudice from redactions can be cured by instructions from the Court. | Overruled |

*All objections that are overruled are without prejudice as to lack of foundation (*e.g.*, business

## GUIDELINES FOR TRIAL IN CIVIL CASES (JURY AND BENCH)

### PRETRIAL ARRANGEMENTS

1. Should a daily transcript and/or real-time reporting be desired, the parties shall make arrangements with the Supervisor of the Court Reporting Services at (415) 522–2079, at least ten calendar days prior to the trial date.

2. During trial, parties may wish to use, *e.g.*, overhead projectors, laserdisk/computer graphics, poster blow-ups, models, or specimens of devices. The

United States Marshal requires a court order to allow equipment into the Courthouse. Parties should be prepared to fix any equipment, if necessary.

### SCHEDULING

1. Trial will normally be conducted from 8:30 a.m. to 2:00 p.m. (or slightly longer to finish a witness), with one 15–minute break and one 40–minute lunch break. Parties must arrive by 8:00 a.m. or, in a jury trial, earlier as needed for any matters to be heard out of the presence of the jury. The jury will be called at 8:30 a.m. The trial week is Monday through Thursday, excluding holidays. Fridays are dark.

### JURY SELECTION

1. In civil jury cases, there are no alternate jurors, and the jury is typically selected as follows. At the outset, 18 potential jurors are called and seated in the jury box and front courtroom bench in the order their names are drawn from the drum. This placement will determine their order in the selection process. The Court will first conduct its voir dire of the entire panel (not just the seated 18) to determine hardships. Jurors excused from the seated 18 will be replaced from those drawn from the panel. The Court will then voir dire the seated 18 for cause. Afterwards, the parties will be allowed a brief follow-up voir dire (15 minutes). Once all voir dire is completed, the Court will address all challenges for cause and excuse those potential jurors who have been successfully challenged. After a short recess, each side may exercise its allotment of peremptory challenges. The plaintiff has the first challenge, the defendant the next two, the plaintiff the next two, and so forth. The default number of peremptory challenges per party or side is three. Any party that passes will be deemed to have used a challenge. The eight (or such other size as will constitute

the jury) surviving the challenge process with the lowest numbers become the final jury. Once the jury selection is completed, the jurors' names will be read again, and they will be seated in the jury box and sworn in. The Court may alter the above procedure in its discretion.

2. Jurors may take notes. Note pads will be distributed at the beginning of each trial. The pads will remain in the jury room at the end of each day. Jurors will be instructed on the use of notes both in the preliminary and final jury instructions.

### TIME LIMITS

1. Ordinarily, the Court shall set fixed time limits for the presentation of evidence by each side at the final pretrial conference. The time limit includes all examination time (whether direct, cross, re-direct, or re-cross) for each witness regardless of which party called the witness. Opening and closing time limits shall be separately considered.

### OPENING STATEMENTS

1. Each side may be subject to a predetermined time limit for its opening statement.

2. Parties must cooperate and meet and confer to exchange any visuals, graphics, or exhibits to be used in the opening statements, allowing for time to work out objections and any reasonable revisions one court day in advance of trial.

3. In a jury case, parties should be prepared to give opening statements as soon as the jury is sworn.

### WITNESSES

1. At the close of each trial day (at 2:00 p.m.), parties shall exchange a list of witnesses for the next full court day and the exhibits that will be used on direct and cross-examination (other than for impeachment of an adverse witness). By 4:00 p.m.

that same day, opposing parties shall provide any objections to such exhibits and further shall provide a list of all exhibits to be used with the same witnesses on cross-examination (other than for impeachment). The Court will address objections before 8:30 a.m. on the following day. The first notice of objection shall be provided one court day prior to the first day of trial. All notices should be provided in writing and filed with the Court, and a courtesy copy should be given to chambers immediately.

2. Parties should always have their next witness ready and in the Courthouse. Failure to have the next witness ready may constitute resting.

3. Parties are expected to cooperate with each other in the scheduling and production of witnesses. Witnesses may be taken out of order if necessary. Every effort shall be made to avoid calling a witness twice (as an adverse witness and later as a party's witness).

4. If a witness is testifying at the time of a recess or adjournment and has not been excused, the witness shall be seated back on the stand when court reconvenes. If a new witness is to be called immediately following recess or adjournment, the witness should be seated in the front row, ready to be sworn.

5. Immediately before each new witness takes the stand, counsel calling the witness shall place on the witness stand a clearly marked copy of each exhibit that counsel expects to have the witness refer to during his or her direct examination. Immediately before beginning cross-examination, counsel conducting cross-examination shall do the same with any additional exhibits to be referenced on cross.

6. If counsel intends to have the witness draw diagrams or put markings on visual exhibits or diagrams prepared by the party calling the witness, the witness shall do so before taking the stand. Once on the stand, the witness shall adopt the diagrams and/or markings and explain what they represent. If the diagram or visual exhibit is prepared by the opposing party, the witness shall not make any markings on the diagram or visual exhibit without leave of the Court.

7. A witness or exhibit not listed in the joint pretrial conference statement may not be called or used without good cause. This rule does not apply to true rebuttal witnesses (other than experts). Defense witnesses are normally considered case-in-chief witnesses, not "rebuttal" witnesses.

## USE OF DEPOSITIONS TO IMPEACH OR SHORT READ-INS

1. Depositions used at trial for impeachment shall comply with the following procedure:

a. On the first day of trial, bring the original and clean copies of any deposition(s) intended to be used. A sealed original copy shall be provided to the Judge.

b. The first time a deposition is read, counsel should state the deponent's name, the date of the deposition, and the name of the lawyer asking the question. If the deposition was a Rule 30(b)(6) deposition, counsel should so state.

c. When counsel reads a passage into the record, counsel should simply say, for example, "I wish to read in page ____, lines ____ to ____ from the witness's deposition." A brief pause will be allowed for any objection.

d. Counsel should then proceed by stating "question" and reading the question exactly, then stating "answer" and reading the answer exactly. Stating "question" and "answer" is necessary so that the court reporter, the Court, and the jury (in a jury trial) can follow who was talking at the deposition.

e. Rather than reading a passage, counsel is free to play a videotaped ver-

sion of the passage, but counsel must have a system for immediate display of the precise passage.

### DEPOSITION DESIGNATIONS

1. The following procedure applies only to witnesses who appear by deposition. It does not apply to live witnesses whose depositions are read in while they are on the stand. To prepare designated deposition testimony, counsel shall photocopy the cover page, the page where the witness is sworn, and each page from which any testimony is proffered, including pages containing a counter-designation made by opposing counsel. Counsel should redact objections or colloquy unless needed to understand the question. In addition, counsel should redact any testimony that has not been designated or any testimony to which an objection has been made and sustained by the Court. Any corrections must be interlineated and references to exhibit numbers must conform to the trial numbers. The finished packet should then be the actual script and should smoothly present the identification and swearing of the witness and testimony desired.

2. Counsel is free to play a videotaped version of any deposition testimony, but counsel must have a system for immediate display of the precise testimony omitting any properly redacted passages.

### EXHIBITS

1. Use numbers only, not letters, for exhibits, preferably the same numbers as were used in depositions. Blocks of numbers should be assigned to fit the need of the case (*e.g.*, Plaintiff has 1 to 100, Defendant A has 101 to 200, Defendant B has 201 to 300, etc.). A single exhibit should be marked only once. If the plaintiff has marked an exhibit, then the defendant should not re-mark it. Different versions of the same document, *e.g.*, a copy with additional handwriting, must be treated as different exhibits. To avoid any party claiming "ownership" of an exhibit, all exhibits shall be marked and referred to as "Trial Exhibit No. _____," not as "Plaintiff's Exhibit" or "Defendant's Exhibit." If an exhibit number differs from that used in a deposition transcript, however, then the latter must be conformed to the new trial number if and when the deposition testimony is read (so as to avoid confusion over exhibit numbers).

2. Exhibits are not to be filed but rather shall be submitted to chambers (two sets). *Exhibits must be premarked. In addition, one set of exhibits must be tagged.* Exhibits shall be three-hole punched and shall be submitted in binders. Sample tags may be obtained from the Courtroom Deputy and are attached as Exhibit A hereto.

3. Parties must consult with each other and with the Courtroom Deputy at the end of each trial date and compare notes as to which exhibits are in evidence and any limitations thereon. If there are any differences, parties should bring them promptly to the Court's attention.

4. In a jury trial, before the case goes to the jury, parties must confer with the Courtroom Deputy to make sure the exhibits going to the jury room are all in evidence and in good order. Parties may, but are not required to, jointly provide a revised list of all exhibits actually in evidence (and no others) stating the exhibit number and a brief, non-argumentative description (*e.g.*, letter from A to B, dated August 17, 1999). This list may go into the jury room to help the jury sort through exhibits. In a bench trial, parties may follow a similar procedure to help the Court sort through exhibits.

### OBJECTIONS

1. Counsel shall stand when making objections and briefly state the basis of the objection.

2. Counsel shall not make speaking objections.

3. There can be only one lawyer per witness per party for all purposes, including objections.

4. In a jury trial, sidebar conferences are discouraged. The procedures outlined in these guidelines should eliminate the need for most sidebars.

5. In a jury trial, to maximize jury time, parties must alert the Court in advance of any problems that will require discussion outside the presence of the jury so that the conference can be held before court begins or after the jury leaves for the day.

### SETTLEMENTS AND CONTINUANCES

1. Shortly before trial or a final pretrial conference, parties occasionally wish jointly to advise the Courtroom Deputy that a settlement has been reached and seek to take the matter off calendar, but it turns out later that there was only a settlement "in principle" and disputes remain. Cases, however, cannot be taken off calendar in this manner. Unless and until a legally binding settlement is reached, all parties must be prepared to proceed with the final pretrial conference as scheduled and to proceed to trial on the trial date, or face dismissal of the case for lack of prosecution or entry of default judgment. To facilitate settlement, the Court is available to place the material terms of a settlement on the record. Only an advance continuance expressly approved by the Court will release parties from their obligation to proceed to trial. If parties expect that a settlement will be final by the time of trial or the final pretrial conference, they should notify the Court immediately in writing or, if it occurs over the weekend before the trial or conference, by voicemail to the Courtroom Deputy. The Court will attempt to confer with the parties as promptly as circumstances permit to determine if a continuance will be in order or if it can assist the parties in putting the settlement on the record. Pending such a conference, however, parties must prepare and make all filings and be prepared to proceed with trial.

2. Civil Local Rule 40–1 provides that jury costs may be assessed as sanctions for failure to provide the Court with timely written notice of a settlement. Please be aware that any settlement reached on the day of trial, during trial, or at any time after the jury or potential jurors have been summoned will normally require the parties to pay juror costs.

## EXHIBIT A